Kenneth MARCELLO, John Dubois, and Cathy Whittaker, Plaintiffs,

v.

Donald REGAN, in his official capacity as United States Secretary of the Treasury, John A. Affleck, in his official capacity as Director of the Rhode Island Department of Social & Rehabilitative Services, George A. Moriarty, Chief Supervisor, Rhode Island Bureau of Family Support and Domestic Relations, Defendants.

Civ. A. No. 83–0252 S.

United States District Court,
D. Rhode Island.

Nov. 8, 1983.

John H. Hines, Jr., Smithfield, R.I.; Stephen M. Miller, John Marks, Providence, R.I., for plaintiffs.

Dennis J. Roberts, III, Atty. Gen., Donald H. Elbert, Alan R. Tate, Asst. Attys. Gen., Wm. M. Walsh, Sp. Asst. Atty. Gen., Providence, R.I., for the State defendants.

Paul D. Barker, Trial Atty., Tax Div., Dept. of Justice, Washington, D.C., Lincoln C. Almond, U.S. Atty., Everett C. Sammartino, Asst. U.S. Atty., Providence, R.I., for federal defendants.

## OPINION

SELYA, District Judge.

The plaintiffs, Kenneth Marcello, John Dubois, and Cathy Whittaker, are Rhode Island residents and wage-earners. Each of them overpaid his or her 1982 federal income tax. Marcello and Dubois also are allegedly delinquent in spousal or child support payments, as is Mrs. Whittaker's husband. Pursuant to the tax refund intercept mechanism authorized by 26 U.S.C. § 6402(c),[1] the federal government transferred all or some material part of the tax overpayment theretofore made by each such plaintiff to the State of Rhode Island. The intercept approach was enacted to provide the states with a simple and straightforward method for recovering, at least in part, amounts paid by the states in welfare benefits to families with dependent children when support-obligated individuals failed to make payments as required. While the

---

1. This program was appended to the Internal Revenue Code as a part of the Omnibus Budget Reconciliation Act of 1981, Pub.L. No. 97–35, 95 Stat. 357 ("OBRA").

program is national in scope, its effectuation has necessarily been on a state-by-state basis.

The plaintiffs contend that the implementation of the intercept program in Rhode Island was accomplished without adequate procedural safeguards and, therefore, deprived the plaintiffs of their constitutional right to due process of law, in breach of the fifth and fourteenth amendments to the United States Constitution. The plaintiffs further claim that the scheme violates the Civil Rights Act of 1871, 42 U.S.C. § 1983. The plaintiffs have moved for certification of this case as a class action pursuant to Fed.R.Civ.P. 23(b)(2); they seek to represent the class of all persons whose income tax refunds have been or will be withheld and paid over to the state pursuant to 26 U.S.C. § 6402(c).

The defendants are all government officials sued in their official capacities.[2] The defendants argue that this action is barred by 26 U.S.C. § 6305(b) and that, to the extent that the plaintiffs seek equitable and declaratory relief, subject-matter jurisdiction is wanting by reason of both the Anti-Injunction Act, 26 U.S.C. § 7421(a), and the Declaratory Judgment Act, 28 U.S.C. § 2201. In addition, the federal defendant asserts that the doctrine of sovereign immunity bars the action against him. Finally, all of the defendants maintain that the program as implemented affords all of the process which is due.

Immediately following the institution of the action, the court, with the consent of the parties, advanced the trial on the merits, consolidated the trial with the hearing on preliminary injunction, see Fed.R.Civ.P. 65(a)(2), and assigned the merged proceedings to go forward on June 30, 1983. The hearing resulted in the submission of the cause essentially on an agreed statement of facts, supplemented in certain respects by the verified amended complaint, documentary exhibits, discovery materials, and a modest quantum of live testimony. The matter has been extravagantly briefed by all parties. After due consideration of these materials, the court grants class certification as indicated post and holds that the implementation of the tax refund intercept program under the joint aegis of the federal government and the State of Rhode Island abridges the class members' due process rights. This opinion sets forth the court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a).

### I. *Background*

The tax refund intercept arrangement is designed to function on an abecedarian plane. Recipients of welfare benefits under the Aid to Families with Dependent Children ("AFDC") program must assign their past-due support obligations to the state as a precondition to receipt of AFDC payments. 42 U.S.C. §§ 602(a)(26)(A), 656(a). In accordance with § 464 of the Social Security Act, 42 U.S.C. § 664,[3] the state is empowered to certify to the Secretary of the Treasury a compendium of names of delinquent obligors. If any person so listed is entitled to a refund of his or

---

**2.** The office held by each defendant is correctly indicated in the case caption.

**3.** This section, entitled "Collection of past-due support from Federal tax refunds," provides in relevant part:

(a) Procedure applicable; distribution

Upon receiving notice from a State agency administering a plan approved under this part that a named individual owes past-due support which has been assigned to such State pursuant to section 602(a)(26) of this title, the Secretary of the Treasury shall determine whether any amounts, as refunds of Federal taxes paid, are payable to such individual (regardless of whether such individual filed a tax return as a married or unmarried individual). If the Secretary of the Treasury finds that any such amount is payable, he shall withhold from such refunds an amount equal to the past-due support, and pay such amount to the State agency (together with notice of the individual's home address) for distribution in accordance with section 657(b)(3) of this title.

. . . . .

(c) Definition

As used in this part the term "past-due support" means the amount of a delinquency, determined under a court order, or an order of an administrative process established under State law, for support and maintenance of a child, or of a child and the parent with whom the child is living.

her federal income tax overpayment, the Secretary, pursuant to 26 U.S.C. § 6402(c),[4] shall reduce the amount of that refund by the amount of any such past-due support and remit that sum to the state. The Secretary is also required, under the statute, to notify the affected taxpayer that the amount of such metachronistic support has been set off from the anticipated tax refund in this fashion. In Rhode Island, welfare recipients assign their overdue support obligations to the Bureau of Family Support of the Department of Social & Rehabilitative Services ("Bureau"); and the Bureau acts for the state in respect to the § 464 certification process.

On or before October 1, 1982, the Bureau certified to the Treasury Secretary the names of 2,542 persons allegedly delinquent in support payments.[5] The amount of past-due support claimed from the persons spotlighted was substantial (aggregating $6,724,051.00). Sometime after October 1, 1982 and before December 15, 1982, the Bureau transmitted the delinquency census to the Department of Health and Human Services ("HHS"). Moreover, in October, 1982, the Bureau mailed a first-notice form letter (the "initial letter") to each of the persons who it had determined, in accordance with Family Court records provided to the Bureau, owed either child or

spousal support (or both). The text of the initial letter is set forth in the margin;[6] in sum, it stated that the Bureau had referred the addressee's name to the Service and that the addressee's tax refund (if any) might be retained to satisfy, wholly or partially, a past-due support obligation. This initial letter also noted the amount claimed to be past-due and cautioned the addressee to contact the Bureau no later than November 24, 1982 if the amount was incorrect. The initial letter was forwarded only to those persons whose names had been certified by the Bureau to the Treasury Department; spouses of those persons were neither separately nor jointly addressed.

Between October and December 15, 1982, the Bureau was responsible for dealing with taxpayers—including the plaintiffs—who responded by telephone or in person to the initial letter. Upon receipt of such an inquiry, Bureau investigators invariably informed the individual whether the amount claimed was or was not correct according to a cursory cross-matching of the individual's receipt records and the Bureau's files. The Bureau would then mail to all who had inquired a second letter which stated either that the person's name would be deleted from the intercept census because the amount of the arrearage was in question[7]

---

4. Section 6402(c) provides:
   The amount of any overpayment to be refunded to the person making the overpayment shall be reduced by the amount of any past-due support (as defined in section 464(c) of the Social Security Act) owed by that person of which the Secretary has been notified by a State in accordance with section 464 of the Social Security Act. The Secretary shall remit the amount by which the overpayment is so reduced to the State to which such support has been assigned and notify the person making the overpayment that so much of the overpayment as was necessary to satisfy his obligation for past-due support has been paid to the State. This subsection shall be applied to an overpayment prior to its being credited to a person's future liability for an internal revenue tax.

5. While the parties have not indicated when the Bureau certified the 1982 list to the Internal Revenue Service ("Service"), 45 C.F.R. § 303.72 mandates an October 1 deadline for submission of the certification. The Service is a unit of the federal Treasury Department.

6. The initial letter contained the Bureau's return address and phone number under the heading "Federal Tax Refund Offset Program." It specified an individual in the Bureau's child support division as a contact person. The text, in its entirety, provided:
   Dear Absent Parent
   Your name is being referred to the Internal Revenue Service (IRS) for collection of past due child and/or spousal support. Any federal income tax refund to which you may be entitled may be retained in full or partial satisfaction of this obligation. Our records show that you owe at least the amount shown below. If you believe this amount is in error, contact us no later than November 24, 1982 at the address or phone number listed above.

7. The full text of this standard affirmative follow-up letter read as follows:
   A review of our records indicate that there is some question regarding the arrearage amount of your account which was submitted to the Internal Revenue Service for intercept.

or that the name would remain on the list because the Bureau, in its infinite wisdom, had determined that the amount claimed was correct.[8] No formal record of such proceedings was constituted, and the Bureau's procedure in this regard was inherently antipathetic to any meaningful judicial review of its administrative doings.

Because a typical joint federal tax return, standing alone, fails to furnish sufficient data to the Service upon which to base an intelligent determination of the proportion or amount of any refund which may be due to a nonobligated husband or wife, the Service, commencing on or about March 28, 1983, dispatched tax statement notifications to affected taxpayers. No separate notices went forward to nonobligated spouses who had filed joint returns; rather, in such circumstances, a single notice was mailed to both spouses. Under the rubric "Overpaid tax applied to past-due support obligation," the notice explained, in substance, that the Service had retained, and would pay to the designated state agency, all or part of the taxpayers' overpayment in order to satisfy a past-due support obligation. The notice also informed the taxpayers that nonobligated spouses who had filed joint returns could object to having their share of the refund amount applied in this manner, and that the Service would bifurcate the overpayment if a 1040X amended federal individual income tax return was filed demonstrating each spouse's share and contribution to the overpayment. Again, the standard text of the notice is commemorated in the margin.[9] Nothing was mentioned as to when the monies would be shifted to the state, or as to any time parameters within which amended returns would have to be filed in order to avert transfer of the funds. Rhode Island formulated no procedure to resolve the dilemma of a nonobligated person who filed a joint return. Instead, the state took the course of least resistance and rou-

> Therefore, we have notified the Internal Revenue Service to delete your name from the intercept list.
>
> Although there will not be withholding of Internal Revenue Service monies from any IRS return you may receive this year, this letter should not be interpreted in any manner whatsoever to mean that you are relieved from any valid child support obligations you may presently have. This letter simply means that there will be no withholding of IRS monies from your return this year. A further review of your case will be made in the near future to clarify the areas that necessitated removal of your name from the Internal Revenue Service intercept list.
>
> There is no need for you to take any action on this matter at this time. You will be notified if further information is needed relative to your child support account.
>
> Thank you for your cooperation.

8. The full text of the standard negative follow-up letter read as follows:

> A review of our records show that the dollar amount sent to the Internal Revenue Service for intercept is correct. There will, therefore, be no change recommended at this time. You will have the opportunity to request a substantive appeal regarding this matter as stated under Public Law 97–35, 95 STAT. 357, and Internal Revenue Code Section 6402(C). Instructions regarding procedures to be followed will be mailed to you by the Internal Revenue Service.

> Thank you for your cooperation.

9. The notice inventoried the amount of overpayment, the amount of the overpayment applied to the alleged past-due support obligation, and the amount to be refunded or applied to estimated tax. The notice also volunteered the following explanation:

> Under authority of section 6402(c) of the Internal Revenue Code, we have kept all or part of your overpayment of tax to fully or partially satisfy a past-due child/spousal support obligation. It will be paid to the state agency named below. If you have questions about this obligation or believe the amount is in error, you should contact the State agency.
>
> If this was a joint return and both spouses had income, the spouse who is not liable for the past-due support may object to having his or her share of the overpayment applied against the other spouse's obligation. We will divide a joint overpayment between spouses if a claim (Form 1040X Amended U.S. Individual Income Tax Return) is filed showing each spouse's share of the tax and contribution to the overpayment. In community property States, the joint overpayment must be divided according to State laws.
>
> If you have questions about your joint overpayment, you may call or write us—see the information in the upper right corner. To make sure that IRS employees give courteous responses and correct information to taxpayers, a second employee sometimes listens in on telephone calls.

tinely referred questions and complaints from nonobligated spouses to the Service.

Plaintiff Dubois and his spouse filed a 1982 joint federal income tax return which reflected a $650.73 overpayment. On March 2, 1983, the Service transferred $593.00 to the Bureau and, sometime later, refunded the balance of $57.73 to the taxpayers. Plaintiff Whittaker and her spouse filed a 1982 joint return which showed a withholding tax credit of $898.88, an earned income credit of $78.00,[10] and a tax due of $237.00. The Service intercepted the entire $739.88 net overpayment and, on March 14, 1983, disbursed it to the Bureau. Plaintiff Marcello filed a 1982 federal income tax return that projected a $445.12 overpayment. On May 16, 1983, the Treasury Department transferred this amount to the state. Since the Service did not begin to forward tax statements until March 28, 1983, it is readily apparent that the Dubois and Whittaker disbursements were each accomplished facts before the Service gave the notice of allocation rights, *see* n. 9 *ante*, to the affected taxpayers.

None of the named plaintiffs had any opportunity to present facts or defenses at a formal administrative hearing under the auspices of either the Service or any state agency prior to the snaring of the tax refunds in question. Indeed, at the time of the institution of this action, the state apparently lacked written policies anent the intercept program.[11]

## II. *Class Certification*

The plaintiffs brought this action for themselves and on behalf of the class of all persons whose federal income tax refunds have been or will be intercepted and transferred to the State of Rhode Island pursuant to 26 U.S.C. § 6402(c). But, the proposed class is overly broad. Class certification "is essentially an exercise of discretion by the district court," *Lamphere v. Brown University*, 553 F.2d 714, 719 (1st Cir.1977), and the scope of the court's discretion in this area is very wide. *De-Grace v. Rumsfeld*, 614 F.2d 796, 809 n. 12 (1st Cir.1980); *Lamphere*, 553 F.2d at 720. The discretion inherent in the court's power to determine whether a class action may be maintained necessarily requires equally broad discretion in determining whether to create subclasses pursuant to Fed.R.Civ.P. 23(c)(4)(B). *In re General Motors Corp. Engine Interchange Litigation*, 594 F.2d 1106, 1129 n. 38 (7th Cir.), *cert. denied sub nom. General Motors Corp. v. Oswald*, 444 U.S. 870, 100 S.Ct. 146, 62 L.Ed.2d 95 (1979). "The underlying theme [of class certification] is flexibility; different cases call for different approaches." *Lamphere*, 553 F.2d at 719. "Overall fairness is the touchstone for evaluating the conduct and resolution of class actions, and the onus for this evaluation is vested in the trial court." *Mendoza v. United States*, 623 F.2d 1338, 1344 (9th Cir.1980), *cert. denied sub nom. Sanchez v. Tucson Unified School District No. 1*, 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981). The need for subclass-

---

**10.** Although the parties to this litigation have, betimes, specifically alluded to the interception of earned income credits, the question whether such credits should be considered "overpayments" subject to detainer under § 6402(c) is not before this court. *Compare Nelson v. Regan*, 560 F.Supp. 1101, 1109–11 (D.Conn.1983) (*"Nelson II"*); (credits not subject to interception) *with Sorenson v. Secretary of the Treasury*, 557 F.Supp. 729, 733–34 (W.D.Wash.1982) (*contra*). Indeed, in their stipulation of agreed facts, the parties included the amount of an earned income credit in a total referred to as an "overpayment." Where the litigants have neither briefed nor argued a distinction, there is scant warrant for the court to tread *sua sponte*. *Cf. United States v. Kobrosky*, 711 F.2d 449, 454 (1st Cir.1983). Thus, while recognizing the special considerations which may impact applica-

tion of the statute to earned income credits, the court will, for purposes of the case at bar, assume (without deciding) that the distinction makes no meaningful difference.

**11.** After suit was filed, two Bureau memoranda were issued, each dated April 19, 1983 and signed by Moriarty. These memoranda collectively set out, on somewhat a tentative basis, state intercept procedures, including a procedure for a post-deprivation hearing. The Bureau subsequently transmitted hearing notices to persons affected by the intercept program. Although these documents indicate some good faith attempt by the state to comply with due process, they are not in issue in this lawsuit. *See Nelson II*, 560 F.Supp. at 1106 n. 6.

es is a decision for the district judge to make, *id.* at 1350, and the decision may be *sua sponte. Geraghty v. United States Parole Commission,* 579 F.2d 238, 253 (3d Cir.1978), *vacated on other grounds,* 445 U.S. 388, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980). Indeed, failure to limit overbroad cases by the use of appropriate subclasses may be an abuse of discretion. *Id.* The "special responsibility" of the district court in administering class suits requires the district judge to ask:

> assuming there are important rights at stake, what is the most sensible approach to the class determination issue which can enable the litigation to go forward with maximum effectiveness from the viewpoint of judicial administration?

*Yaffe v. Powers,* 454 F.2d 1362, 1367 (1st Cir.1972). And, in formulating an answer to this inquiry, Rule 23(c)(4)(B) mandates that each subclass must independently meet the requirements of Rule 23 for maintenance of a class action. *Betts v. Reliable Collection Agency, Ltd.,* 659 F.2d 1000, 1005 (9th Cir.1981).

In the case at bar, the prospect of a unitary class is less than inviting because of the involvement of both support-obligated taxpayers and the spouses of those taxpayers—spouses who are not themselves support-obligated, but who are enmeshed in the web of the intercept program solely by the filing of joint returns. The rights of the latter may well be superior to, and surely different than, the former; and a reflexive accession to the plaintiffs' request for class certification, as framed, would inevitably compress two distinctly disparate peas into one cramped pod.

■ This action will therefore be certified as a class action with two subclasses. The first subclass will include all persons whose names were transmitted to the Treasury Department, *i.e.,* allegedly delinquent obligors, and whose federal income tax refunds were intercepted. The second subclass will encompass "nonobligated spouses"—all persons who filed joint federal tax returns and whose names were not included on the list sent to the Secretary, but

who nevertheless had income independent of their spouses' earnings and had refunds intercepted in whole or in part.

Each such subclass satisfies the prerequisites of Fed.R.Civ.P. 23(a). The size of each subclass is sufficiently great that joinder is impractical; there are questions of law of common application within each subclass; Marcello and Dubois have claims which are fairly representative of the support-obligated taxpayer subclass, and Whittaker, the third named plaintiff, has a claim which is sufficiently typical of the plaints of the second subclass; and there is no reason to believe that the plaintiffs (and their attorneys) will not fairly and adequately protect the interests of both and each of the subclasses. Finally, the defendants have implemented the intercept program uniformly among the subclass members, which would make final injunctive and declaratory relief appropriate for either or both of the subclasses.

It is true that the circumstances of this case do not present any compelling need for class certification. If the equitable relief requested by the plaintiffs is granted, all persons similarly situated will benefit from the resultant procedural protection. But, if the requirements of Fed.R.Civ.P. 23 are met, the fact that no special need for class certification exists is a slender reed upon which to predicate a denial of class certification. *See, e.g., Geraghty v. United States Parole Commission,* 579 F.2d at 252; *Vickers v. Trainor,* 546 F.2d 739, 747 (7th Cir.1976); *Fujishima v. Board of Education,* 460 F.2d 1355, 1360 (7th Cir.1972). Therefore, to the extent the plaintiffs request injunctive and declaratory relief, and subject to the subclasses created by the court, the motion for class certification is granted pursuant to Fed.R.Civ.P. 23(b)(2).

### III. *The Defendants' Threshold Arguments*

#### A. *26 U.S.C. § 6305(b)*

The defendants argue that the plaintiffs' suit is barred by 26 U.S.C. § 6305(b). This is a matter upon which federal district courts are in disagreement. *Compare Nelson v. Regan,* No. N 82–173 (D.Conn. June

15, 1982) (*"Nelson I"*) (Order denying state defendant's motion to dismiss) and *Sorenson v. Secretary of the Treasury*, 557 F.Supp. at 733 (likewise rejecting preclusionary argument) *with Vidra v. Egger*, 575 F.Supp. 1305 (E.D.Pa.1982) (§ 6305(b) bars suit). This court does not read the statute as an impediment to its jurisdiction in the context of this case.

█ Section 6305(a) limns a scenario which, superficially, bears some likeness to the tax intercept mechanism authorized by § 6402(c).[12] Section 6305(b), set out in its entirety in the margin,[13] is a jurisdictional provision which states in substance that no federal court shall have jurisdiction of any action "brought to restrain or review the assessment and collection of amounts by the Secretary *under subsection (a)."* (emphasis added). The italicized words of limitation are the reason why the defendants' argument must fail. Despite the family resemblance, §§ 6305(a) and 6402(b) are not sisters under the skin.

Section 6305(a) does not directly implicate tax refund amounts: it merely authorizes the Service to withhold overdue support obligations in precisely the same manner that it withholds federal income tax payments. The interception of refunds amounts is, at bottom, quite distinct from the § 6305(a) scheme. Beneath whatever kindred surface gloss may exist, the statutes are neither related by necessary implication nor married by congressional fiat. In point of fact, the very acts upon which § 6305(a) pivots—assessment, levy, and collection—are inapposite in the § 6402(c) context. And, it is these pivotal actions which § 6305(b) ordains must proceed free from judicial interference. Indeed, the distinction between the two mechanisms is highlighted by a review of the relevant language in OBRA, the legislation which enacted § 6402(c) and thereby created the intercept device. Section 6305, enacted in 1975 by Pub.L. No. 63–647, 88 Stat. 2358, is mentioned only fleetingly in OBRA.[14] Had Congress intended the jurisdictional limita-

---

**12.** Section 6305(a) provides that

[u]pon receiving a certification from the Secretary of Health, Education, and Welfare, under section 452(b) of the Social Security Act with respect to any individual, the Secretary shall assess and collect the amount certified by the Secretary of Health, Education, and Welfare, in the same manner, with the same powers, and (except as provided in this section) subject to the same limitations as if such amount were a tax imposed by subtitle C the collection of which would be jeopardized by delay, except that—

(1) no interest or penalties shall be assessed or collected,

(2) for such purposes, paragraphs (4), (6), and (8) of section 6334(a) (relating to property exempt from levy) shall not apply,

(3) there shall be exempt from levy so much of the salary, wages, or other income of an individual as is being withheld therefrom in garnishment pursuant to a judgment entered by a court of competent jurisdiction for the support of his minor children, and

(4) in the case of the first assessment against an individual for delinquency under a court or administrative order against such individual for a particular person or persons, the collection shall be stayed for a period of 60 days immediately following notice and demand as described in section 6303.

References in this statute to "the Secretary" are to the Secretary of the Treasury. There is no

longer a federal executive department known as "Health, Education, and Welfare." For purposes germane to the subject statutes, its functions have been assumed by the Department of Health and Human Services. 20 U.S.C. § 3508. Therefore, the Secretary of Health, Education, and Welfare, now the Secretary of Health and Human Services, will be referred to herein simply as "HHS."

**13.** Section 6305(b) provides that

[n]o court of the United States, whether established under article I or article III of the Constitution, shall have jurisdiction of any action, whether legal or equitable, brought to restrain or review the assessment and collection of amounts by the Secretary under subsection (a), nor shall any such assessment and collection be subject to review by the Secretary in any proceeding. This subsection does not preclude any legal, equitable, or administrative action against the State by an individual in any State court or before any State agency to determine his liability for any amount assessed against him and collected, or to recover any such amount collected from him, under this section.

**14.** Congress, in OBRA, amended § 6305(a)(4) by striking out "court order" and replacing it with "court or administrative order." Pub.L. No. 97–35 § 2332(g), 95 Stat. 357, 862 (1981).

tion of § 6305(b) to apply to the § 6402(c) intercept plan, surely it would have so specified. But neither section refers to the other. There is simply no indication that Congress intended § 6305(b), which by its own terms addresses only § 6305(a), to apply to § 6402(c).[15] Indeed, the Congress seems knowingly to have chosen a different route.

### B. 26 U.S.C. § 7421(a)

The Anti-Injunction Act, 26 U.S.C. § 7421(a), prohibits the maintenance of any "suit [brought] for the purpose of restraining the assessment or collection of any tax."[16] The purpose of the Anti-Injunction Act is to protect the "Government's need to assess and collect taxes as expeditiously as possible with a minimum of pre-enforcement judicial interference, 'and to require that the legal right to the disputed sums be determined in a suit for refund.'" *Bob Jones University v. Simon*, 416 U.S. 725, 736, 94 S.Ct. 2038, 2045, 40 L.Ed.2d 496 (1974) (quoting *Enochs v. Williams Packing & Navigation Co.*, 370 U.S. 1, 7, 82 S.Ct. 1125, 1129, 8 L.Ed.2d 292 (1962)). The Act, which has no recorded legislative history, has been given an expansive reading by the Supreme Court. *Bob Jones University*, 415 U.S. at 738–42, 94 S.Ct. at 2046–48.

■ The defendants argue that the Anti-Injunction Act bars this suit (a position which appears to spring full-blown from the brow of their persistent confusion of the intercept program with the assessment program). The fly in this particular ointment is that the diversion of income tax refunds is not "the assessment or collection of [a] tax." A tax refund can be intercepted only after the Service has calculated a tax liability and determined that the tax has been overpaid. At that point, assessment and collection are ancient history. Cases arising under § 6402(c) do not present, in any meaningful sense, controversies about the amount of tax owed; persons such as the instant plaintiffs have, almost by definition, paid their income taxes—and more. A suit to recover an intercepted refund can have no impact on either the amount of *tax* which the government will collect or on the method and manner by which the government may collect it. And, judicial intervention will not run athwart the government's need for a steady and predictable flow of tax revenues. While the defendants' contention has some appeal on policy grounds, it falls lamentably short as a matter of statutory construction. Such anfractuous reasoning cannot suffice to pitch § 6402(c) into the wishing well of the Anti-Injunction Act. Thus, 26 U.S.C. § 7421(a) does not foreclose this litigation. *See Nelson I*, slip op. at 4–5; *Sorenson v. Secretary of the Treasury*, 557 F.Supp. at 733.

### C. The Declaratory Judgment Act

■ The defendants' asseveration that the Declaratory Judgment Act, 28 U.S.C. § 2201,[17] precludes this suit is premised on

---

**15.** The legislative history of § 6402(c) refers to the § 6305(a) paradigm in the following way: "The authority which is provided in current law for collection by the Internal Revenue Service of amounts which represent delinquent child support payments would be amplified in the following way." Omnibus Budget Reconciliation Act of 1981, Pub.L. No. 97–35, 95 Stat. 357, H.R.Con.Rep. No. 97–208, 97th Cong., 1st Sess. 985, *reprinted in* 1981 U.S.Code Cong. & Ad. News 396, 1347. The report goes on to explain, very briefly, the operation of the intercept program, *id.;* no further reference to § 6305(a) appears. This isolated and casual reference is manifestly insufficient to slide § 6402(c) within the prophylactic integument of § 6305(b) in the face of the express language of the latter statute.

**16.** The Anti-Injunction Act provides that

[e]xcept as provided in sections 6212(a) and (c), 6213(a), 6672(b), 6694(c), 7426(a) and (b)(1), and 7429(b), no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed.

**17.** The Declaratory Judgment Act provides:

In a case of actual controversy within its jurisdiction, except with respect to Federal taxes other than actions brought under section 7428 of the Internal Revenue Code of 1954 or a proceeding under section 505 of 1146 of title 11, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further

a kindred mischaracterization of the intercept procedure as a "tax." The Declaratory Judgment Act expressly denies federal courts the power to grant declaratory relief "with respect to Federal taxes." *Id.* The reasoning in Part III(B) hereof, *ante*, applies with equal force here: this litigation is not an action with respect to federal taxes. The limitation in 28 U.S.C. § 2201 is, therefore, inapplicable. *See Nelson II*, 560 F.Supp. at 1103–04; *Sorenson*, 557 F.Supp. at 733. Indeed, neither the Declaratory Judgment Act nor the Anti-Injunction Act "contemplate[s] barring actions, such as this, where the litigation [does] not threaten to deny anticipated tax revenues to the Government." *Eastern Kentucky Welfare Rights Organization v. Simon*, 506 F.2d 1278, 1284 (D.C.Cir.1974), *vacated on standing grounds*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). *Accord Church of Scientology v. Egger*, 539 F.Supp. 491, 494 (D.D.C.1982).

### D. Sovereign Immunity

The federal defendant also avers that the doctrine of sovereign immunity bars the plaintiffs' claims against him in his official capacity. The parties do not seriously dispute that this suit is directed at the federal government. It is black-letter law "that relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter." *Hawaii v. Gordon*, 373 U.S. 57, 58, 83 S.Ct. 1052, 1053, 10 L.Ed.2d 191 (1963) (per curiam). *Cf. Edelman v. Jordan*, 415 U.S. 651, 663, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974); *Muniz Ramirez v. Puerto Rico Fire Service*, 715 F.2d 694 at 697 n. 4 (1st Cir. Aug. 26, 1983). The United States, *qua* sovereign, is immune from suit absent its explicit consent. *Lehman v. Nakshian*, 453 U.S. 156, 160, 101 S.Ct. 2698, 2701, 69 L.Ed.2d 548 (1981). To the extent that redress for the plaintiffs would "restrain the Government from acting, or . . . compel it to act," such relief would, in general, be foreclosed by sovereign immunity. *Larson*

*v. Domestic and Foreign Commerce Corp.*, 337 U.S. 682, 704, 69 S.Ct. 1457, 1468, 93 L.Ed. 1628 (1949).

But, there are exceptions to the doctrine of sovereign immunity. The principle does not interdict suits which allege "that agents of the government have exceeded their constitutional authority while purporting to act in the name of the sovereign." *Berk v. Laird*, 429 F.2d 302, 306 (2d Cir.1970), *cert. denied sub nom. Orlando v. Laird*, 404 U.S. 869, 92 S.Ct. 94, 30 L.Ed.2d 113 (1971). *See also Dugan v. Rank*, 372 U.S. 609, 621–22, 83 S.Ct. 999, 1006–07, 10 L.Ed.2d 15 (1963); *Larson*, 337 U.S. at 689–91, 69 S.Ct. at 1461–62. This is true even where relief will require the sovereign to take affirmative action. *See Hampton v. Mow Sun Wong*, 426 U.S. 88, 93 n. 5, 96 S.Ct. 1895, 1900 n. 5, 48 L.Ed.2d 495 (1976); *Smith v. Lehman*, 689 F.2d 342, 345 (2d Cir.1982). Because the plaintiffs in this litigation argue that the implementation of the intercept program abrogated their constitutional right to due process of law in violation of the fifth amendment, the federal defendant is not shielded by sovereign immunity and is properly before this court in the person of defendant Regan. *See Nelson II*, 560 F.Supp. at 1104.

### IV. Procedural Due Process Considerations

Having thus disposed of each and all of the initial array of arguments urged by the defense, the court now crosses the threshold and enters into consideration of the core issues central to the litigation.

The defendants apparently do not dispute that the plaintiffs have a property interest in their tax refunds. Using this springboard, the plaintiffs next contend that they have been deprived of this property without due process. The court's inquiry, therefore, must focus on whether the procedures followed by the state and federal governments in intercepting the plaintiffs' refunds satisfied the constitutional impera-

---

relief is or could be sought. Any such declaration shall have the force and effect of a final

judgment or decree and shall be reviewable as such.

tives of the fifth and fourteenth amendments.

■ The United States Supreme Court "consistently has held that some form of hearing is required before an individual is finally deprived of a property interest." *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 901, 47 L.Ed.2d 18 (1976). *Accord Wolff v. McDonnell*, 418 U.S. 539, 557–58, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974). Essential to the right to be heard is adequate notice "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). While announcing broad due process guidelines, "[i]t has been said so often by [the Supreme] Court and others as not to require citation of authority that due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972).

In conformity with the Supreme Court's approach to due process inquiries, *Mathews v. Eldridge* provides the framework of analysis for determining the requirements of due process under the specific circumstances of this litigation. *Cf. Memphis Light, Gas & Water Division v. Craft*, 436 U.S. 1, 17, 98 S.Ct. 1554, 1564, 56 L.Ed.2d 30 (1978).

[I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. at 335, 96 S.Ct. at 903.

The private interest involved in the case at bar is clear—the plaintiffs are entitled to tax refunds. The members of each subclass are, by definition, wage-earners. It is not asserted that the interception of their tax refunds deprives them of their sole means of support; thus, this is far from the kind of deprivation described in *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). But, it is deprivation nonetheless, and deprivation of a sort which could have a meaningful impact on the taxpayer's standard of living. It is beyond cavil that many persons predictably plan for and rely on the certainty of a refund and often commit the entire amount well before it is received. Family planning and budgeting in many instances doubtless incorporate the anticipated check. Nor are such actions cavalier, as a tax refund is not a subsidy or an example of paternalistic largesse; it is nothing more or less than the restoration to a taxpayer of his or her own funds (borrowed interest-free, in a sense, by the Treasury). In sum, the interception of the refund is not only a diversion of the taxpayer's property—but a potentially disruptive one. Other courts which have considered this question are, it would appear, in harmony with this reasoning. *E.g., Nelson II*, 560 F.Supp. at 1108; *Sorenson*, 557 F.Supp. at 738. And, while the worthy purpose of the legislation and the innate distaste for those who shirk familial obligations tend to cloud the high ground of constitutional principle, such subjective judgments are a luxury which the courts cannot indulge. The protections of the Constitution are not reserved for popular, or even socially acceptable, causes.

The risk of erroneous deprivation through the current procedures is substantial. Indeed, Whittaker is a nonobligated spouse, and Dubois contends that he and the Bureau had agreed on an amount due and a payment schedule prior to the triggering of the intercept device. None of the plaintiffs had any opportunity to protest interception before it was accomplished. The state offered no challenge procedure

whatever. The Service acted upon the certification received from the state, and the Bureau requisitioned the diversions based mainly upon evaluation of its own records—an evaluation which was, by its very nature, perfunctory. Judicial review was not available. In addition, the initial letter, while allowing room to quibble about the exact amount owed, seemed plainly to indicate that the interception of the addressee's refund was already a foregone conclusion. Given the high risk of undeserved deprivation and the realistic potential for disruptive impact, the probable value of additional safeguards is great. Adequate notice and an opportunity to be heard could eliminate (or at least substantially reduce) the hazards of an unwarranted taking.

The state government's interest is undeniably significant.[18] The intercept program gives the state the opportunity to recoup—with a minimum of effort—the amount of assistance payments which it has been compelled to advance because an obligated spouse and-or parent has defaulted. The benefits of this policy accrue directly to the citizenry. In an era when both parental and hymeneal responsibility has been eroded, and when there is all too little reluctance to permit government to shoulder one's rightful burdens, the public's stake in the objectives of the intercept paradigm is manifest.

But, the desirability of the goal cannot, in and of itself, comprise the be-all and the end-all. In our society, the greatest good for the greatest number cannot suffice as a justification for the subversion of constitutionally-protected rights. This is patently not a case where summary administrative action is the only reasonable avenue by which a vital government interest can be safeguarded. *See, e.g., Ewing v. Mytinger & Casselberry, Inc.,* 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950); *Bowles v. Willingham,* 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892 (1944). Even if the state is unable instantly to intercept an obligor's re-

fund, it is not without recourse. As the assignee of the support obligation, the state may invoke other available means to collect the past-due amount. The intercept method, albeit admittedly simpler and less expensive than the alternative techniques, is by no means a *sine qua non* to the governmental end. Nor does the statute present an all-or-nothing proposition, for the mechanism can operate with respectable efficacy even if synchronized with the Constitution.

Additional procedural safeguards—particularly the institution of some kind of hearing procedure—would, it is true, involve increased administrative costs and burdens. But the implementation of such measures may, by materially decreasing the risk of errant deprivation, help the state to avoid the need to resort to more cumbersome collection methods at a later time. Moreover, it cannot be gainsaid that the very existence of the intercept program gives the state considerable leverage over those delinquent obligors who are entitled to tax refunds. Most significant, the procedural steps needed to eradicate the taint of unconstitutionality could, in all probability, given a reasonable degree of effort and efficiency on the state's part, be completed before the time that the Service would normally refund or transfer overpayments. The treasury regulations require the state to certify the names of delinquent obligors to the federal government by October 1. 45 C.F.R. § 303.72(c). The evidence indicates that the earliest date on which a named plaintiff's refund was delivered to the state was March 2, 1983. Even if the Service was able to transfer the amounts earlier (and, in this respect, it is noted that the tax return necessary to catalyze the refund apparatus cannot itself be filed until January 1), the state has an adequate length of time in which to transmit notification and to coordinate and conduct hearings on disputed claims.

---

**18.** The federal government, too, has a legitimate concern in view of its subsidization of AFDC benefits.

Such a conclusion is buttressed by the knowledge that this is not the grievous type of privation which would require a full-blown hearing. *Cf. Goldberg v. Kelly, supra.* The circumstances do, however, warrant some opportunity for affected individuals to meet in a somewhat structured setting with a representative of the Bureau who possesses the authority to take meaningful action under the circumstances. The probably low educational level of the majority of individuals affected as well as their likely inability to procure assistance to dispute such claims indicate that written submissions alone would be inadequate. *See Mathews v. Eldridge,* 424 U.S. at.345, 96 S.Ct. at 907; *Goldberg v. Kelly,* 397 U.S. at 269, 90 S.Ct. at 1021. The purpose of such a hearing would be, of course, to minimize the possibility that a wrongful deprivation will occur. *Mackey v. Montrym,* 443 U.S. 1, 13, 99 S.Ct. 2612, 2618, 61 L.Ed.2d 321 (1979). Where, as here, the risk of aleatory harm can be appreciably lessened by easily-implemented state action, the scales tip inexorably in favor of the claimants.

Nor would a postdeprivation hearing be an appropriate alternative under the circumstances. When dealing with seizures of property under color of established state procedures, due process has generally been "held to require predeprivation notice and hearing in order to serve as a check on the possibility that a wrongful deprivation would occur." *Parratt v. Taylor,* 451 U.S. 527, 538, 101 S.Ct. 1908, 1914, 68 L.Ed.2d 420 (1981). The Court in *Parratt* described in some detail the sort of situations which warrant the by-passing of predeprivation proceedings. Typically, the loss involved is not the result of an established government practice; the state cannot predict precisely when the loss will occur; the loss is generally beyond the control of the government; and it would be impractical, if not impossible, to provide a meaningful hearing prior to the deprivation. *Id.* at 541, 101 S.Ct. at 1915. No such extraordinary circumstances come into play here.

There is no indication, nor any basis to believe, that predeprivation proceedings would be impossible or impractical in this situation. The state knows when the intercept process will begin; indeed, it controls the initiation of that process. It is not constitutionally necessary, in any event, that the administrative hearing antedate the certification of the census by the state to the Service; it is sufficient if a proper notice is given and the hearing held prior to the time the refundable amount would ordinarily be in order for disbursement. *Fuentes v. Shevin,* 407 U.S. 67, 80–82, 92 S.Ct. 1983, 1994–1995, 32 L.Ed.2d 556 (1972); *Sniadach v. Family Finance Corp.,* 395 U.S. 337, 342, 89 S.Ct. 1820, 1823, 23 L.Ed.2d 349 (1969). "Where ... the opportunity for such a hearing is given prior to seizure, the constitutional requirement that property not be taken without 'due process of law' has been met." *Laughlin v. Walters,* 718 F.2d 513 at 515 (1st Cir.1983).

Given this panoply of circumstances, the court is constrained to hold that the members of the putative subclasses are constitutionally entitled to notice and to an opportunity to be heard "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965); and that, therefore, the conduct of the tax intercept program in Rhode Island was in derogation of the due process rights of the plaintiffs as guaranteed by the fifth and fourteenth amendments.

### V. *Relief*

As the plaintiffs' prayer for a declaratory judgment must be granted, the court turns now to a consideration of the nature and scope of the relief to be afforded.

With respect to individuals whose tax refunds referable to calendar 1982 have heretofore been intercepted and disbursed to the state, a supplementary notice shall be sent by the state defendants to all such persons informing them of their rights to an administrative hearing and to judicial review, and further advising them of the general nature of the potential defenses

available to them. *See* text, *post.* Such notices shall, insofar as may be practicable, be separately addressed as between support-obligated taxpayers and nonobligated spouses; and, as to the latter, shall plainly specify their rights in the premises (it being recognized, however, that the state has no inherent authority to allocate refund amounts as among taxpayers filing joint returns, that authority being the exclusive prerogative of the Service). These notices shall be sent within thirty days of the date of the entry of the below-described order. The provisions of this paragraph shall apply, as the context permits, to both subclasses.

With respect to support-obligated individuals whose names have been or will be certified to the Secretary of the Treasury by the Bureau referable to calendar 1983, in pursuance of 42 U.S.C. § 664, *see* note 3, *ante*, the state defendants shall forthwith furnish written notice to all such persons, informing them of their rights to an administrative hearing and to judicial review, and further advising them of the general nature of the potential defenses available to them. *See* text, *post.* These notices shall, as to such individuals whose names have already been so certified, be sent at the earliest practicable date (and in no event more than ten days next following the entry of the order). And, as to support-obligated persons whose names have not yet been so certified by the Bureau for 1983, the notice shall in each case be sent no later than the date upon which such certification is made.

With respect to support-obligated individuals whom the Bureau desires so to certify to the Treasury Secretary for future years, the state defendants shall provide written notice to each such person (in the form delineated in the preceding paragraph), in each case to be forwarded no later than the date upon which such certification is made.

The form of notice shall, in each instance, limn, in clear and concise language, possible defenses to the interception, including (without limitation of the generality of the foregoing) lack of the requisite assignment under 42 U.S.C. § 602(a)(26)(A), absence of a court order for support, discharge in bankruptcy applicable to the support obligation, mistaken identity, and/or inaccuracy in the amount of past-due support asserted. The notice shall also inform the recipient, in general terms, of the rights of nonobligated spouses vis-a-vis tax refunds in the event joint returns are or have been filed.

The administrative review contemplated hereby must, except as to taxpayers whose refunds have heretofore been intercepted, be on a predeprivation basis, before a hearing officer or other official designated by the Bureau. The hearing officer must be authorized to act for the Bureau in (i) deleting names from the list certified to the Service, (ii) correcting errors in the amounts claimed by the state, and (iii) rebating, in cases where the refund amounts have already been intercepted and transferred to the state (*e.g.*, 1982 taxpayers), amounts ascertained to have been diverted erroneously. While the review need not rise to the dignity of a plenary adjudicative hearing, the procedure must permit each complainant personally to appear, to present relevant documentary evidence, and to examine the materials upon which the Bureau relied in making the certification. The administrative decision must be reviewable in the state courts pursuant to the Rhode Island Administrative Procedure Act, R.I.Gen.Laws § 42–35–15; but the pendency of such judicial proceedings need not forestall nor delay the interception and disbursement of the tax refund in question. The decision of the hearing officer shall be in writing and shall be rendered within thirty days next following the close of the evidence at the hearing (and, as to 1983 and subsequent years, prior to the interception and transfer of funds).

The federal defendant shall cooperate with the Bureau as may be reasonably required in regard to the foregoing; and shall establish such additional procedures (if any are necessary) as to permit the state, in a predeprivation mode, effectively to amend its certification list to reflect the

results of the aforedescribed administrative hearing process.

The Service shall, upon appropriate application, refund the nonobligated spouse's portion of an intercepted income tax refund if a joint return has been filed. In all such instances, the Service shall continue to issue a joint notice informing the taxpayers that, if one of them is a nonobligated spouse, he or she may apply to the Service for his or her portion of the refund (and if, after a joint return is filed, the Service is notified in writing of a change in the address of either spouse, the Service shall mail a duplicate copy of the joint notice to that taxpayer at his or her address). Except as hereinbelow provided, the notice shall be sent prior to the actual transfer of the intercepted funds by the Service to the state, and no such transfer shall be made for a period of thirty days next following, in order to permit nonobligated taxpayers to have a reasonable time before deprivation occurs within which to amend their returns. The notice shall specifically apprise affected taxpayers of the significance of this time constraint. The Service shall, however, be excused from compliance with the requirements of the two preceding sentences if, and to the extent that, the Service acknowledges its responsibility for returning to the taxpayer the refund share allocable to a nonobligated spouse, irrespective of whether or not the same has already been sent by the Service to the state.[19] The provisions of this paragraph shall be for the benefit of the second subclass; and in no event shall compliance herewith unreasonably delay the normal operation of the refund process.

The court recognizes that, with respect to implementation of the intercept program in future years, certain of the conditions noted herein (including but not limited to the time parameters) should be susceptible to necessary change, so long as the price of such flexibility does not implicate the fundamental fairness which due process re-

quires. The court also is mindful of the value of formulating its final grant of relief by the vehicle of a precisely-drafted order spelling out in greater detail notice and hearing procedures consonant with the foregoing. To this end, the court will meet with all counsel on November 16, 1983 at 8:15 a.m. in regard to the form of its order. The court will, likewise, retain jurisdiction both for the purpose of determining what (if any) injunctive relief may be appropriate and for consideration of an award of counsel fees and costs. *See Nelson II*, 560 F.Supp. at 1111.

For the reasons stated herein, the motions to dismiss heretofore filed by the defendants are each denied.

*Settle order on notice.*

---

**19.** While the question has not been briefed in this litigation, it appears to the court that, as a matter of law, even good-faith compliance by the Service with § 6402(c) would not relieve the federal government of its legal responsibility to honor a timely amended return properly claiming refund entitlement by a nonobligated spouse.