Leonard T. BROWN, et al., Plaintiffs,

v.

Thomas EICHLER, et al., Defendants.

Civ. A. No. 84–582–CMW.

United States District Court,
D. Delaware.

June 11, 1987.

John X. Denney, Jr., and Sandra E. Messick, UAW, Legal Services Plan, Newark, Del., for plaintiff.

Patricia H. Dailey, Deputy Atty. Gen., Dept. of Justice, Wilmington, Del., for defendants.

## OPINION

CALEB M. WRIGHT, Senior District Judge.

In 1981, as part of the Omnibus Budget Reconciliation Act of 1981, Pub.L. No. 97–35, 95 Stat. 357 (1981), Congress established a system whereby state governments could intercept the tax refunds of parents who owe child support payments to

the state. The Federal Office of Child Support Enforcement ("OCSE") of the United States Department of Health and Human Services issues instructions to the States for establishing procedures to effect the intercept, but each State has significant leeway in establishing its own procedures within these guidelines. Plaintiffs in the instant action are parents who owe or owed child support payments to the State of Delaware or non-obligated spouses of parents who owe or owed child support. Defendant Thomas Eichler is the Secretary of the Delaware Department of Health and Human Services, and defendant Frank Hindman is the Chief of the Department of Child Support Enforcement ("DCSE"). Plaintiffs brought this action seeking declaratory and injunctive relief that the present Delaware Tax Refund Intercept Program ("TRIP") unconstitutionally violates plaintiffs' rights to procedural due process under the Fifth and Fourteenth Amendments to the United States Constitution. Now before the Court are cross-motions for summary judgment.

THE TAX REFUND INTERCEPT PROGRAM

The mechanics of the tax intercept program serve as the backdrop to the plaintiffs' case. TRIP is a mechanism for the Federal Government to aid the State governments in collecting past due child support obligations. Support obligations are assigned to the State by a custodial parent so that the custodial parent can receive Aid to Families with Dependent Children ("AFDC") support from the State. When the State determines that past due child support is owed to the State, it notifies the OCSE, which in turn notifies the Internal Revenue Service ("IRS"). The IRS will then send any tax refund due to the obligated parent to the State instead of the individual. That refund, intercepted by the State, will reduce the monetary obligation of the absent parent to the State. TRIP is essentially a system used to attach an asset, the tax refund, to pay a pre-existing debt, the child support obligation.

The specifics for TRIP are found in several federal statutes. First, recipients of AFDC benefits are required to assign their rights to past due support payments to the State. 42 U.S.C. §§ 602(a)(26)(A), 656(a) (1983). The State is then authorized to certify to the Federal Secretary of the Treasury that certain taxpayers are delinquent in their child support payments. The Secretary may then reduce any tax refund due to the delinquent obligor and send that money to the State to which the support payments are owed. 26 U.S.C. § 6402(c) (1986).

Three governmental departments administer TRIP: the IRS; the OCSE, under the aegis of the Department of Health and Human Services; and, in Delaware, the DCSE under the State Department of Health and Human Services. The State must codify a procedure for determining whether support payments are past due, notify the federal government, and notify the delinquent taxpayer in accordance with federal regulations. 45 C.F.R. § 303.72.[1]

A governmental system aimed at intercepting an individual's tax refund raises constitutional due process questions. The procedures challenged in this case concern the notice and review plaintiffs receive. The DCSE sends a list of obligated taxpayers to OCSE. Before the IRS is informed, a pre-offset notice is sent to the taxpayers. The State agency bears the cost of sending the notice. Fox Aff.[2] That notice informs

---

**1.** Defendants submitted to the Court a nine-page document entitled "Division of Child Support Enforcement-Tax Refund Intercept Program" which counsel stated at oral argument to be the internal operating procedures for the DCSE. (Transcript at 58). Defendant, pursuant to the Court's request, has submitted an Affidavit of Paul Fox, a Tax Intercept Coordinator, attesting to the fact that this document is the current Delaware TRIP system. Defendant also submitted an Action Transmittal from the OCSE,

dated July 31, 1986 in conjunction with Mr. Fox's Affidavit. This transmittal represents the federal government's instructions to the State in setting up TRIP procedures. Counsel for plaintiffs, as indicated by their decision not to join the federal agencies, does not claim any violations by the federal agencies in the administration of the TRIP system. Plaintiffs' counsel's letter of April 22, 1987.

**2.** After receiving the Fox Affidavit, the Court received a letter from plaintiffs' counsel contest-

the absent parent of the right to contest the past due support; the right to administrative review by the State; procedures for requesting administrative review; and that the IRS will notify the non-obligated spouse in cases where a joint return is filed. The notice also includes the amount of money owed and an address and telephone number for the person to use to contest the offset.

If an individual requests administrative review, DCSE will send a notice to the absent parent informing them of the time and place for review. A pre-hearing conference is held 24 to 36 hours after an inquiry is received in an attempt to resolve the disputes before the hearing. Fox Aff. The hearing itself is to be conducted by an independent DCSE officer. The officer can administer oaths to witnesses; exclude evidence; limit unduly repetitive proof, rebuttal and cross-examination; and decide to modify or delete the tax intercept. DCSE has the burden to present a prima facie case, and then the ultimate burden of proof rests on the obligated parent. The hearing is held on the record, and the decision is reviewable in Family Court. 10 *Del.Code Ann.* § 921(13) (1986). The time frame for holding an Administrative Hearing is 45 days. Fox Aff.[3] If a deletion or modification of the off-set results, the DCSE will notify the OCSE within the normal update process, or, if the change occurs after January, OCSE will be notified within ten days. If money has already been offset, DCSE will promptly refund the money.[4]

## FACTS

Despite the Court's ruling, *infra,* that it cannot cure the 1983 violations, it is necessary to describe the facts that brought these plaintiffs to Court. On October 8, 1983, plaintiffs Luther Hutchens, Stephen Mlynarczyk, Doris Walker, Chris Walton, and James Whitlow received notices that their child support obligations were past due and that their names had been referred to the IRS.[5] Plaintiffs Leonard Brown and James Hall did not receive notice at that time. By November 25, 1983, Mlynarczyk, Walker, Walton and Whitlow had submitted requests for investigation to DCSE. After receiving no response, plaintiffs sent a second request for investigation in January of 1984. In February, James Godfrey, then the Tax Offset Coordinator at DCSE, responded to their request by stating that the offsets had been investigated and were proper. This notice did not inform the plaintiffs of any further rights to review. Nevertheless, Hutchens, Mlynarczyk, Walker, Walton and Whitlow all requested hearings.

Meanwhile, Leonard Brown received notice from the IRS in March 1984 that his tax refund was going to be withheld. He requested a review, received a response similar to that of the other plaintiffs, and then requested an administrative review.

ing Mr. Fox's assertion that the State bears the cost of sending the notice. The basis for this contention is part of the deposition testimony of Mr. Hindman, in which he testified that the federal government sent the notice and that the State was charged $2.20 an offset without a particular charge for the notice. Mr. Hindman's testimony does not conflict with Mr. Fox's Affidavit because, as explained in defense counsel's letter of May 15, 1987, the notice charge is incorporated into the offset charge assessed by the federal government. Moreover, as will be discussed *infra,* the relevant TRIP system is the one in use presently, not the one in use in 1983 to which Mr. Hindman referred. Mr. Fox's Affidavit refers to the present system. The Court finds that there is no issue as to a material fact on this issue and the State bears the cost of the notice. As a side note, it is interesting that plaintiffs contest the assertion that the State bears the notice cost, because, as will be discussed *infra,* the due process conten-

tions become more weighted in plaintiffs' favor if the State already bears the cost than if the federal government bears the cost.

3. According to the Federal Action Transmittal, fn. 1, *supra,* the forty-five day limit only applies to interstate cases. Based on Mr. Fox's Affidavit and defense counsel's letter of May 15, 1987, the State incorporates the interstate time frame into the intrastate system.

4. The procedure described above was not in place at the time of the intercepts which represent the factual core of this case. As will be discussed *infra,* the Court finds that it is the present system that requires the Court's attention in the due process section of the Opinion.

5. Facts relating to the procedures each plaintiff underwent are found in Plaintiffs' Appendix ("P.A."), A–3–A–8.

On April 5, 1984, tax intercept coordinator Daniel Bungy held an administrative review for Brown, Mlynarczyk, Whitlow, Walker, Hutchens and Walton. Bungy affirmed the intercepts, again without informing them of their review rights.

On April 6, 1984, Mr. and Mrs. Hall received a notice of offset from the IRS. They had never received a notice that their names were sent to the Department of Treasury.

Mrs. Hall and Mrs. Walton, the non-obligated spouses, were never notified of the impending tax refund, defenses, or the appeal rights to which they were entitled. Defendants' Amended Answer ¶ 50; P.A. A-58; Deposition of Daniel Bungy, P.A. A-84. Non-obligated spouses are the present spouses of absent parents who owe support payments. The defenses available to non-obligated spouses are distinct from those that their obligated spouses have. A non-obligated spouse's property interests are implicated in the TRIP system when joint returns are filed. The portion of a tax refund attributable to the non-obligated spouse's income cannot be intercepted. A supplemental form needs to be sent to the IRS in order to insure that only that portion of the tax refund attributable to the obligated parent is intercepted.

The 1983 tax refunds were intercepted in the spring and summer of 1984. Plaintiffs filed suit in this case in the fall of 1984, some time after their tax refunds were intercepted. Pursuant to the Court's request, plaintiffs' counsel provided a list of the current child support obligations of the plaintiffs. Plaintiffs Brown, Mlynarczyk, Walker, and Hutchens no longer owe child support payments to the State. Plaintiffs Whitlow, Chris Walton and James Hall remain obligated for child support. Nancy Walton and Helen Hall, the non-obligated spouse plaintiffs, are still subject to the TRIP program because of their husbands' obligations. Plaintiffs' Counsel's Letter of April 22, 1987.

The events that occurred in 1983 and the current TRIP system create several due process questions. First, what should be included in the notice that the absent parents receive? Second, what kind of hearing are the parents entitled to and when? Third, what rights do the non-obligated spouses have to protect the portion of the tax refund attributable to their income? Before the Court can answer these questions, however, the parties have raised several threshold jurisdictional questions that must be answered. These jurisdictional issues are mootness, standing, state sovereign immunity, and qualified immunity of the state officials in their individual capacity.

DISCUSSION

I. STANDING AND MOOTNESS

■ Because the DCSE abandoned the tax intercept system that lies at the core of this case in 1985, defendants argue that plaintiffs' claim is moot. When there no longer is a case or controversy between the parties, the Court lacks jurisdiction over the case. *Iron Arrow Honor Society v. Heckler*, 464 U.S. 67, 70, 104 S.Ct. 373, 374, 78 L.Ed.2d 58 (1983). The most direct answer to this contention is that plaintiffs contend that the procedures defendants began to use in 1986 are also constitutionally defective; therefore, a real controversy still exists over which this Court has jurisdiction. Further, plaintiffs contend that they have a right to a remedy for the violations that occurred in the past. Plaintiffs are not simply seeking to alter the system prospectively but are also seeking a remedy for the past violations. Whether or not this Court has jurisdiction to determine that the past system was unconstitutional and award relief is a question not of mootness but of sovereign immunity.[6]

■ Defendants also contend that plaintiffs lack standing because none of them are presently subject to the intercept.

---

6. Plaintiffs also contend that this case is not moot because voluntary cessation of illegal conduct does not render a case moot. *DeFunis v. Odengaard*, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974); *United States v. W.T. Grant*, 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1968). Because the Court finds that a present controversy exists, the Court need not decide whether the case fits into this exception to the mootness rules.

Past wrongs, standing alone, are insufficient grounds for a court to grant injunctive relief. *City of Los Angeles v. Lyon,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). The plaintiffs must demonstrate a genuine likelihood that they will suffer the same harm again in the future. *Id.* at 105–110, 103 S.Ct. at 1666–70. As of now, Whitlow, Walton, and Hall still owe support money to the State. Whitlow Deposition at 16; Walton Dep. at 48; IRS notification of withholding to the Halls, April 6, 1987 (as explained in plaintiffs' counsel's letter of April 22, 1987). They stand in a position where there is a reasonable likelihood of suffering the same harm in the future. Moreover, this Court's award of injunctive relief will have a direct effect on ensuring that the plaintiffs will not suffer the complained of harm. *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). In terms of prospective injunctive relief, some of the plaintiffs have satisfied the standing requirements.

In terms of withholding for past years, all the plaintiffs have alleged a distinct injury, deprivation of property without due process. Like in the mootness context, the question of whether the Court can grant relief for the past harms is not a standing question but a question of sovereign immunity.

## II. SOVEREIGN IMMUNITY

■ When, as here, individuals sue state officials for acts done in accordance with state law but allegedly in violation of federal law, a court must address the issue of state sovereign immunity.[7] When state officials are sued in their official capacity, the State is a real party in interest and can invoke its sovereign immunity protection. *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 101, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984). State sovereign immunity is an outgrowth of the Eleventh Amendment to the United States Constitution:

> The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

While the Amendment on its face does not bar suits against a state by its own citizens, the Supreme Court has held that a non-consenting state is immune from suits in federal courts that are brought by its own citizens as well as citizens of other states. *Edelman v. Jordan,* 415 U.S. 651, 662–663, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1973); *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed 842 (1890).

In *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), the Supreme Court established an important exception to the Eleventh Amendment interpretation first espoused in *Hans.* In *Young,* the Supreme Court held that a suit challenging the constitutionality of a state official's enforcement of a state law is not a suit against the State. *Young,* 209 U.S. at 159–160, 28 S.Ct. at 453–54. *Young* theorized that an unconstitutional statute is void such that the official could not be immune from "the supreme authority of the United States." *Id.* at 160, 28 S.Ct. at 454; *Green v. Mansour,* 474 U.S. 64, 106 S.Ct. 423, 426, 88 L.Ed.2d 371 (1985).

The remedy allowed in *Young* was prospective injunctive relief. The Supreme Court held that the Eleventh Amendment was not a bar to the federal courts ordering a state official to cease violating federal law in the future. The Supreme Court has "refused to extend the reasoning of *Young,* however, to claims for retrospective relief." *Green v. Mansour,* 474 U.S. 64, 106 S.Ct. 423, 426, 88 L.Ed.2d 371 (1985). *See also, Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 102–103, 104 S.Ct. at 909; *Quern v. Jordan,* 440 U.S. 332, 337, 99 S.Ct. 1139, 1143,

---

7. The state law in this case is the procedure promulgated to avail the State of the benefits of the federal TRIP program. The federal law violated is not the TRIP regulations but federal constitutional law. Plaintiffs do not contend that the federal program or the actions of the federal agencies violate the constitution, as is reflected by the decision not to name the federal government as a defendant. Plaintiffs' counsel's letter of April 22, 1987.

59 L.Ed.2d 358 (1979); *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).

The retrospective-prospective distinction is implicated in this case because the plaintiffs seek more than an injunction requiring the State to use constitutional procedures in the intercept program in the future. The plaintiffs also request an injunction against the State from, among other things, "[h]olding plaintiffs previously intercepted income tax refunds." At oral argument, plaintiffs contended that the least plaintiffs were entitled to were new notices and hearings under constitutionally proper procedures for the past intercepts. (Transcript at 26). The Court must evaluate the Eleventh Amendment's effect on these two different remedies. The Court's power to order the State to use a new procedure in the future is well settled. *Ex Parte Young.* The Eleventh Amendment section of the Opinion is only concerned with the plaintiffs' requested remedies for past withholding. First, the Court will rule on the Eleventh Amendment's effect on an attempt to recover money for the past, and then the Court will decide whether it can order the State to re-do the hearings for the past intercepts.

## A. Recovery of Previously Intercepted Refunds

■ Plaintiffs' request for an injunction requiring the state to release the previously intercepted refunds must be denied because that request for injunctive relief is in essence a request for monetary relief from the State. *Edelman v. Jordan* determines the result on this issue. In *Edelman,* the plaintiffs sought declaratory and injunctive relief against the state officials who administered the federal-state program of Aid to the Aged, Blind or Disabled ("AABD") for administering the program in violation of federal law. Part of the injunctive relief requested was "a permanent injunction enjoining the defendants to award to the entire class of plaintiffs all AABD benefits wrongfully withheld." *Edelman,* 415 U.S. at 656, 94 S.Ct. at 1352. The Supreme Court held that although the federal court had the power to enjoin the state officials

from violating the law in the future, the court could not award the retroactive benefits wrongfully withheld. "While the Court of Appeals described this retroactive award of monetary relief as a form of 'equitable restitution', it is in practical effect indistinguishable in many aspects from an award of damages against the State." *Id.* at 668, 94 S.Ct. at 1358. The same is true in the instant case. In either situation, awarding money from the State—whether phrased as injunctive or monetary damage relief—is in fact the same thing: a requirement that the State monetarily compensate a victim for a past harm. Such retrospective, monetary relief runs afoul of the Eleventh Amendment.

## B. Ordering the State to Re-do the Old Hearings

The more difficult Eleventh Amendment question arises from the plaintiffs' request that the Court at least enjoin the State to re-do the past procedures for the old intercepts under the new, constitutional procedures. Within this question are two subparts. First, the Court must determine whether the State must re-do hearings for 1983 intercepts—intercepts that were completed prior to the filing of this action. Second, the Court must determine whether it can order the State to re-do hearings for intercepts done during the pendency of the litigation. This Court finds that it cannot order the State to re-do the hearings for 1983, but it can order new hearings for the later years.

### 1. The 1983 Intercept

■ The boundaries of the appropriate remedies allowable under the Eleventh Amendment are difficult to define. On the most superficial level, prospective relief is permissible, while retrospective relief is not. *Green,* 106 S.Ct. at 426. The distinction between retrospective and prospective relief depends not on when the relief is awarded but on when the violation for which relief is awarded occurs. All relief, whether damages or injunctions, must be given in the future. If that relief is aimed at remedying a past harm, it is considered

retrospective relief and barred by the Eleventh Amendment. By contrast, a remedy aimed at curing a present violation in the future is considered prospective relief. Last, direct awards of monetary relief against the State are forbidden, while awards with only an ancillary effect on the State treasury are permissible. *Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979).

The question for this Court with respect to the 1983 intercept is whether an injunction aimed at remedying a past due process violation that only has an ancillary effect on the state treasury—only new hearings will be required; there will not be a direct award of money—can be issued in the context of a case where there is an ongoing state official's violation of federal law, but the injunction for new hearings for the past is not needed to remedy the situation for the future.[8]

This question is a somewhat anomalous one because the relief requested is neither retrospective monetary relief nor prospective injunctive relief. Instead, it is retrospective, injunctive relief. It is retrospective, injunctive relief because at the time the plaintiffs filed suit, the intercept process for the 1983 tax year had already been completed. If the Court could order new hearings for 1983, it could also order new hearings for years farther into the past. An examination of *Quern v. Jordan, Milliken v. Bradley,* 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977), and *Green v. Mansour* suggests that the request for retrospective injunctive relief is barred by the Eleventh Amendment. The Court reaches this result because ordering the 1983 hearings re-done has no bearing on the prospective remedy, and the requested relief is a form of compensation for past wrongs.

In *Quern v. Jordan,* the Supreme Court held that Federal Courts had the power to order state officials to send notices to the plaintiff class members informing them "that their federal suit is at an end, that the federal court can provide them with no further relief, and that there are existing state administrative procedures which they may wish to pursue." *Quern,* 440 U.S. at 332, 99 S.Ct. at 1141. This notice relief is significant for the prospective-retrospective debate because it notified the plaintiffs that they may be able to recover benefits due in the past. The Court held that the notice relief was not retrospective, because the "chain of causation" between the federal court remedy and the State actually paying money "is by no means unbroken." *Id.* at 347, 99 S.Ct. at 1148. The Supreme Court reasoned that plaintiff class members still had to decide if they wished to pursue the administrative procedures, "[a]nd whether or not the class members will receive retroactive benefits rests entirely with the State, its agencies, courts, and legislature, not with the federal court." *Quern,* 440 U.S. at 348, 99 S.Ct. at 1149 [footnote omitted]. The real purpose for the notice, however, was to serve as a "mere case management device." *Green,* 106 S.Ct. at 427. Even though there was a potential for retrospective relief, the Court allowed the notice relief because the most direct goal of the notice relief was related to the prospective relief issued in the case. The Supreme Court viewed the notice relief as "ancillary to the prospective relief already ordered by the court." *Id.* at 349, 99 S.Ct. at 1149.[9]

In upholding the notice as ancillary to prospective relief, the Supreme Court cited to *Milliken v. Bradley,* 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977). In *Milliken,* the Supreme Court held that ordering the State to fund remedial education programs was aimed at eliminating "the continuing effects of past misconduct." *Milliken,* 433 U.S. at 290, 97 S.Ct. at 2762. The Supreme Court held "that the pro-

---

8. As will be discussed *infra,* the present procedure violates due process for failure to provide adequate notice.

9. In the instant case, the plaintiffs are asking for an order requiring the State to re-do the old hearings and not simply a notice that the plain- tiffs may be able to request a new hearing from the State. Unlike *Quern,* the chain of causation between the federal order and the State remedy is direct. There still remains the issue of whether the State will actually refund money should the plaintiffs prevail in the hearings.

grams are also 'compensatory' in nature does not change the fact that they are part of a plan that operates *prospectively* to bring about the delayed benefits of a unitary school system." *Id.* (emphasis in original). The remedy in *Milliken,* though it included a retrospective component, was primarily aimed at desegregating the schools in the future. The theory underlying *Quern* and *Milliken* is that when there is an ongoing violation of federal law, the remedy may have some retrospective aspect to it when that retrospectivity is related to remedying the present violation.

The holding in *Milliken* is difficult to reconcile with most of the Supreme Court's Eleventh Amendment jurisprudence because of the strong compensatory element included in the injunctive remedy awarded against the State. *See Clark v. Cohen,* 794 F.2d 79, 85 (3d Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 459, 93 L.Ed.2d 404 (Becker, J. concurring). Even if *Milliken* is read broadly to suggest that some retrospective relief is available under the Eleventh Amendment, the situation in the instant case does not fit within the *Milliken* approach.[10] In *Milliken,* the Supreme Court held that the remedial programs were necessary to prospectively correct the continuing harms of past discrimination. The Third Circuit applied *Milliken* in holding that the Eleventh Amendment did not bar the federal courts from ordering the states to fund a specific kind of rehabilitation for a mentally handicapped individual when the funding was needed to "undo the harmful effects of past constitutional violations." *Clark v. Cohen,* 794 F.2d at 84. The plaintiff in *Clark* was suffering from the ongoing effects of the State's past wrongs and needed something other than money to be made whole. By contrast, the instant case's violations are discrete for each year. There is no ongoing harm other

than the loss of refunds never repaid, an item for which the federal court cannot give relief. The Court does not believe that the Third Circuit would read the "continuing effects" exception to the normal Eleventh Amendment jurisprudence found in *Milliken* to apply to a case involving direct monetary loss.

In *Green,* the Supreme Court elaborated on the requirement that there must be an ongoing violation of federal law to allow a remedy with a retrospective component. The plaintiffs in *Green* were challenging some of Michigan's procedures for calculating AFDC benefits. Before the district court made a determination on the merits, federal law changed, and Michigan complied with the new law. Nevertheless, the district court awarded the plaintiffs notice relief like in *Quern* and a declaratory judgment that the past system violated federal law.

The Supreme Court found that state sovereign immunity barred both the notice and declaratory relief awarded by the district court because neither was reasonably ancillary to prospective relief. The declaratory judgment component was held to be barred because the only effect it could possibly have would be to serve as "res judicata on the issue of liability" in a state court action to recover past benefits. *Green,* 106 S.Ct. at 428. Thus, the declaratory judgment would have "much the same effect as a full-fledged award of damages or restitution by the federal court, the latter kinds of relief being of course prohibited by the Eleventh Amendment." *Id.*

Although ordering an old hearing re-done would not have the same effect as the declaratory judgment in *Green* would have had, it is nevertheless a direct order against the State requiring it to repair a wrong done in the past. More important is

---

10. The factual context of *Milliken* is that of desegregation, an area in which the Supreme Court has necessarily expanded remedial powers to cure racial discrimination in this country. This special factual context is important to consider when applying the *Milliken* holding on sovereign immunity to other factual situations. *See, e.g., Clark,* 794 F.2d at 87 (Becker, J. concurring); Fletcher, "A Historical Interpretation

of the Eleventh Amendment", 35 Stan.L.Rev. 1033, 1122 (1983) ("At least where certain types of fourteenth amendment rights are at stake, the Court apparently feels that the *Edelman* formulation is too grudging and the underlying cause of action is more important than any interest in a consistent application of a quasi-jurisdictional limitation on the availability of remedies against a state in federal court.")

the fact that the remedy sought here, like the remedy sought in *Green* is not reasonably ancillary to remedying ongoing violations. This is true even though, like in *Quern* and *Milliken,* the Court finds that there is an ongoing violation in this case. In *Quern,* the notice relief was needed to inform the plaintiffs that they had won their suit with respect to the future as well as informing the class of the possibility of recovery for the past. The remedial education program in *Milliken* was one component of a systematic overhaul of the Detroit school system.

By contrast, the remedy sought here is wholly unrelated to the present violation. For the future, as will be discussed *infra,* all that is needed is an improved notice. Ordering the State to re-do the 1983 hearings will only affect the 1983 violations. This is true because each year's due process deprivation is discrete in that the intercept only applies for funds of a particular year. Rather than simply notifying the plaintiffs about potential rights the plaintiffs have vis-a-vis the State, the plaintiffs seek a specific remedy against the State.[11] That an ongoing violation exists here and no ongoing violation existed in *Green,* is a distinction without a difference because the remedy asked for in this case can be definitively separated into its retrospective and prospective components. In *Quern,* the notice relief could not be separated from the prospective relief granted. Here, the prospective relief will be a new notice procedure; it is unnecessary to grant a new notice and hearing for the past to effect the prospective goal. In *Green,* there was no present violation such that there was no reason to make a ruling about the past system. Here, the Court can rule on the present system and remedy the problem, but there is no justification for remedying the 1983 system.

The Court believes that the injunctive relief for the past violations is retrospective in the same way that the notice and declaratory relief were retrospective in *Green.* The *Edelman* court noted that, "as in most areas of the law, the difference between the type of relief barred by the Eleventh Amendment and that permitted under *Ex Parte Young* will not in many instances be that between day and night." *Edelman,* 415 U.S. at 651, 94 S.Ct. at 1350; *see, e.g., Clark v. Cohen,* 794 F.2d 79 (3d Cir.1986) (competing conceptions of the Eleventh Amendment found in the majority and concurrence). As in *Edelman,* the plaintiffs' harm here "is measured in terms of a monetary loss [the lost refunds] resulting from a past breach of legal duty [no due process] on the part of the defendant state officials." *Edelman,* 415 U.S. at 668, 94 S.Ct. at 1358.

Lying at the core of the prospective-retrospective distinction in Eleventh Amendment jurisprudence is the inherent tension between state sovereign immunity and the Federal Supremacy Clause.[12] The Eleventh Amendment immunizes States from certain remedies, but, if taken to the logical extreme, state sovereign immunity would emasculate the supremacy clause. "[T]he availability of prospective relief of the sort awarded in *Ex Parte Young* gives life to the Supremacy Clause, ... But compensatory or deterrence interests are insufficient to overcome the dictates of the Eleventh Amendment." *Green,* 106 S.Ct. at 426. A balance between the constitutional provisions has been struck at the point of the retrospective-prospective distinction. When the purpose of a remedy is only to compensate for the past violations, the Eleventh Amendment takes precedence over the Supremacy Clause. Such is the case here. Any request for relief for refunds wrongfully intercepted in 1983 is denied as barred by the Eleventh Amendment.

### 2. Intercepts from 1984 to the Present

■ Because the intercepts for the 1983 tax year were completed long before the filing of the complaint, the Court cannot remedy those intercepts. However, reme-

---

**11.** There is no need for notice relief in this case because it is not a class action.

**12.** "This Constitution, and the Laws of the United States ... shall be the supreme Law of the Land." U.S. Const. art. VI.

dies sought for all the intercepts effected subsequent to the complaint's filing should be viewed as requests for prospective relief. This view comports with the approach taken in *Smith v. Onondaga County*, 619 F.Supp. 825 (N.D.N.Y.1985).

In *Smith,* the plaintiffs filed suit in 1983 once they received the initial notice of a potential intercept. Before the decision was rendered in *Smith,* New York had changed its notice and hearing procedures. These new procedures were held to pass constitutional muster. 619 F.Supp. at 830. The *Smith* court held, however, that the procedures utilized in 1983, contemporaneous with the filing of suit, violated due process such that the plaintiffs were entitled to a remedy. Damages could not be awarded because of the Eleventh Amendment. *Id.* Instead, the court ordered the State to re-do the hearings for 1983.

The *Smith* court did not elaborate on the distinction between these two remedies, but the distinction reflects an application of standard Eleventh Amendment jurisprudence. A direct damage award from the state treasury is not recoverable. *Edelman v. Jordan.* Ordering the state to re-do the old hearings that occurred after the complaint was filed is a proper ordering of prospective, injunctive relief. *Ex Parte Young.* Although the remedy, when finally given, cured a past intercept, that remedy, when first requested, was prospective. Measurement of prospectivity should be from the time the complaint is filed, not the time the remedy is awarded.[13]

The Court will follow the *Smith* holding in awarding new hearings for the 1984 through the 1987 intercepts. The *Smith* approach does not apply for the 1983 withholdings, however, because these intercepts were completed before the complaint was filed. Unlike the instant case, the plaintiffs in *Smith* filed suit when the intercept process had begun, thus making the request for relief prospective. This factual distinction between *Smith* and the instant

case leads the Court to hold that it has the authority to order the State to re-do the hearings held for the 1984 intercept through the 1987 intercept, but it does not have the authority to order the State to re-do the 1983 hearings.

### III. QUALIFIED IMMUNITY

■ Plaintiffs also seek relief against defendants in their individual capacity. Because the defendants' actions did not violate clearly established constitutional rights, the qualified immunity available for executive officials relieves them of any personal liability. In *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1981), the Supreme Court established an objective standard for determining whether or not the qualified immunity protection would apply to a particular official's actions. The Court held that, "... [G]overnmental officials performing discretionary actions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738.

This standard facilitates the ability of courts to grant summary judgment in favor of public officials on insubstantial allegations. *Meding v. Hurd,* 607 F.Supp. 1088, 1110 (D.Del.1985). The last five years have seen a large number of federal court cases adjudicating the constitutionality of TRIP systems. *See,* cases, *infra.* While some cases have struck down procedures as unconstitutional, others have upheld state systems. With respect to past violations, the state of the case law has evolved significantly since the time of the first alleged deprivation.

Most important here is the case *Hudson v. Tweed,* C.A. No. 82–363–WKS (D.Del. March 13, 1984) (adopting Magistrate's Report and Recommendation dated December 7, 1983), *aff'd.,* 749 F.2d 26 (3d Cir.1984).

---

**13.** The remedies requested in the original complaint were much more limited than in the amended complaint. However, plaintiffs requested relief against the system as early as October 10, 1984, and prospectivity for all reme-

dies should be measured from that date. No matter how prospectivity is measured, the Court cannot order a recovery of money that will come directly from the State treasury.

In *Hudson,* the Magistrate upheld the constitutionality of the 1982 version of the TRIP program. That determination was affirmed without opinion by a district judge and the Third Circuit. Though this Court is not bound by the determination in *Hudson,*[14] that such a case existed demonstrates that the acts of defendants Hindman and Eichler were not clearly unconstitutional. Even if the defendants knew that some district courts had struck down state TRIP systems as unconstitutional, the opinions of the various courts were not unanimous such that it cannot be said that there exists a clearly established constitutional standard in this area. The claims against the defendants in their individual capacity will, therefore, be dismissed as barred by the doctrine of qualified immunity.

## IV. PROCEDURAL DUE PROCESS

Plaintiffs' due process claims revolve around three contentions. First, plaintiffs contend that the notice received is deficient because it fails to describe the defenses available to the absent parent. Plaintiffs also contend that the hearing procedures are unconstitutional because they fail to guarantee a pre-deprivation review. Last, the spouses of the absent parents claim a due process violation because these non-obligated spouses are not notified individually until the time that the IRS has already intercepted the refunds. The Court will rule on the due process claims with respect to the procedures presently in use.[15]

Defendants' response to plaintiffs' due process arguments is primarily based on *Hudson v. Tweed.* The Court is not bound to follow the Third Circuit's judgment order in *Hudson.* In the Third Circuit's Internal Operating Procedures, judgment orders may be used in certain situations when a "written opinion would have no precedential or institutional value." Internal Operating Procedures, Chapter 6.

The Court will not follow the judgment order in *Hudson* because of the particular circumstances of that case and subsequent TRIP decisions. First, the focus of the *Hudson* case was not on the constitutional due process issues. Instead, the Magistrate's Report focused upon the existing federal regulations—which have been changed—and the defenses that Mr. Hudson sought to raise. Also, the Magistrate noted that, "the failure to give [pre-deprivation] notice is at least partially attributable to [the plaintiff's] own failure to keep the Bureau of Child Support Enforcement [the predecessor to DCSE] apprised of his current address." Magistrate's Report at 9. Much of the Magistrate's Report thus seems to rely more on the specific facts of the *Hudson* case than on any overview of the TRIP program.

The Magistrate's approach is logical because Mr. Hudson represented himself pro se and there were only two district court cases addressing the constitutional issues of TRIP. *Nelson v. Regan,* 560 F.Supp. 1101 (D.Conn.1983), *aff'd.,* 731 F.2d 105 (2d Cir.), *cert. denied, sub nom. Manning v. Nelson,* 469 U.S. 853 (1984); *Sorenson v. Secretary of the Treasury,* 557 F.Supp. 729 (W.D.Wash.1982), *aff'd.,* 752 F.2d 1433 (9th Cir.1985), *c.ff'd.,* 475 U.S. 851, 106 S.Ct. 1600, 89 L.Ed.2d 855 (1986).[16] Because both of these cases concentrated on the non-obligated spouse's rights, the Magistrate held that they did not apply to the *Hudson* case. The case law existing at the time *Hudson* was decided was not as developed as it is today. Lacking any particular guidance from the Third Circuit and given the evolving TRIP law throughout the country, this Court will not be bound by *Hudson* in evaluating the constitutionality of the TRIP procedures in Delaware. *Cf. Lecates v. Justice of the Peace Court No. 4, Etc.,* 637 F.2d 898, 902–905 (3d Cir.1980)

---

**14.** *See* discussion, *infra.*

**15.** The Court's remedial approach for the intervening years between the decision and the complaint is *infra.*

**16.** The decisions in *Nelson* and *Sorenson* conflicted on the issue of whether the States could intercept payments involving earned-income credits. Neither the Supreme Court decision in *Sorenson,* which upheld the intercept of earned-income credit payments, nor the circuit courts in *Nelson* and *Sorenson* discussed the due process issues.

(discussing limitations on the binding nature of a Supreme Court summary affirmance).

The constitutional right to due process before the deprivation of property is a flexible right. *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). In each case in which the government deprives an individual of his property rights, a court needs to evaluate the competing interests that arise in the particular case to determine what process is due. The Supreme Court has structured the decisionmaking process courts should undergo in adjudicating due process claims. *Mathews v. Eldridge,* 424 U.S. 319, 324, 96 S.Ct. 893, 897, 47 L.Ed.2d 18 (1976). The Supreme Court listed three factors a court should balance:

> First, the private interest that will be affected by the official action; second, the risks of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the fiscal and administrative burdens that additional or substitute procedural requirements would entail. *Id.* at 324, 96 S.Ct. at 897.

The Court will apply these factors to each contention plaintiffs make.

■ The first factor is identical for all of plaintiffs' claims. The private interest involved is the individual's property interest in a tax refund. *Nelson v. Regan, supra.* An individual's interest in a tax refund does not rise to the level of interest in welfare payments implicated in *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), because the refund payment is not the sole means of support; however, depriving an individual of a tax refund could have a "meaningful impact on the taxpayer's standard of living. It is beyond cavil that many persons predictably plan for and rely on the certainty of a refund and often commit the entire amount well before it is received." *Marcello v. Regan,* 574 F.Supp. 586, 596 (D.R.I.1983). The private interest involved thus is not to be taken lightly.

## A. Notice to the Obligated Parent

■ One "fundamental requirement of due process ... is notice reasonably calculated under all the circumstances to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). The notice required depends in large part upon the notice's recipients; that is, the notice should be effective at communicating the rights of the recipients in an understandable fashion. *Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 15, 98 S.Ct. 1554, 1563, 56 L.Ed.2d 30 (1978). In *Memphis Light,* the Supreme Court held that a notice to utility users that service would be terminated if the bill wasn't paid needed to include notice that a grievance procedure was available because some of the consumers may not have known or understood that such procedures were available. *Id.* at 15, n. 15, 98 S.Ct. at 1563. n. 15. *See also Finberg v. Sullivan,* 634 F.2d 50 (3d Cir. 1980).

■ Other district courts have held that the TRIP system requires that the state issue notices that include potential defenses available to the obligated parent. *See, e.g., Nelson v. Regan; Marcello v. Regan; Smith v. Onondaga County,* 619 F.Supp. 825 (N.D.N.Y.1985) (approving of a state notice that includes a list of defenses). Motivating these holdings is a belief that the TRIP programs are complicated, confusing, and primarily aimed at relatively unsophisticated individuals. *Nelson,* 560 F.Supp. at 1107. In order for these people to understand that the intercept is not a *fait accompli,* they need to know more than that they can contest the determination that past due support is owed. These individuals need to understand what defenses are available if they are to believe that the right to review is a right worth exercising.

The Third Circuit Court of Appeals has required notice to include some important defenses in an analogous context. In *Finberg v. Sullivan,* 634 F.2d 50 (3d Cir.1980), a judgment debtor contested the constitu-

tionality of Pennsylvania's post-judgment garnishment procedures. The Third Circuit held that the notice Mrs. Finberg received was unconstitutionally defective because it failed to apprise her of several important defenses. *Id.* at 61. The court cited the *Memphis Light* case in finding that notice of the defenses was necessary because it was unlikely that the debtor would be aware of these defenses. *Finberg,* 634 F.2d at 62.

The instant case also involves a debtor who has had a judgment rendered against him in the form of a support order. Nevertheless, when the "creditor" sought to recover the debt against a particular piece of property, the "debtor" should have been entitled to separate, effective notice. *Id.* at 58. In *Finberg,* separate notice was required before garnishing the bank account to pay the judgment debt, and to be effective that notice had to include certain defenses. Here, separate notice is required before a child support order can be used to intercept a tax refund. That notice should also include the defenses available to the debtor. *See Nelson,* 560 F.Supp. at 1107.

Finally, the second and third prongs of the *Mathews* balancing test require the inclusion of a list of defenses in the notice. Most important is the minimal added burden to the state of including a list of defenses in the notice. The State government already bears the cost of sending the initial notice. Fox Aff. The only burden the State will face in adding defenses to that notice is the one-time cost of rewriting the form notice sent to the obligated parents. This minimal burden is far outweighed by the private interest involved and the potential benefit such a list of defenses can have for the plaintiffs. If an absent parent understands what potential defenses are available, he will know what

issues to raise with the state, thereby reducing the risk of an erroneous deprivation. The more detailed notice will be of great value to the individual and of minimal cost to the State. In short, the Court finds that the *Mathews* balance tilts in favor of mandating a notice that lists available defenses.

### B. Notice to Non-Obligated Spouses

■ The non-obligated spouses in this action contest the procedures available to them to protect their portion of the tax refund to which they and their respective spouses were entitled. Under the current procedures, the initial notice sent to the obligated parent includes a paragraph notifying the individual that if he is married and planning to file a joint return, the IRS will notify them at the time of offset of the steps necessary to protect the portion of the tax refund attributable to the non-obligated spouse's work. When the IRS sends the notification that the tax refund has been offset, it includes a reasonably detailed explanation of the way to recover the non-obligated spouse's portion of the refund.

The Court finds that the present system comports with due process in that the notice will "inform the recipient, in general terms, of the rights of non-obligated spouses vis-a-vis tax refunds in the event joint returns are or have been filed." *Marcello,* 574 F.Supp. at 599; *see also Coughlin v. Regan,* 584 F.Supp. 697, 710 (D.Me.1984), *aff'd.,* 768 F.2d 468 (1st Cir.1985) (recognizing need for informing non-obligated spouses of potential for IRS intercept).[17] The cases cited above stand for the proposition that the state, in its initial notice to the obligated parent should include notice of the potential effect the offset will have on the non-obligated spouse.[18]

---

**17.** The affirmance did not reach the merits because appellants were appealing from a consent judgment.

**18.** The Court is not in a position to decide the proper procedures that the IRS needs to follow for the simple reason that the IRS or the Department of Treasury is not a defendant in this action. Because it is the IRS that must ultimately determine the allocation of portions of a

refund, the only issue for this Court is whether pre-deprivation notice from the State is necessary. Plaintiffs' counsel stated in the April 22, 1987 letter that the plaintiffs were not contesting the federal statutes nor the actions of federal employees in running the TRIP program.

Requiring the state to send a separate notice to the non-obligated spouse would impose an undue burden on the state without appreciably increasing the protection afforded to the non-obligated spouse. To do so would require the state to incur additional mailing costs plus costs incurred in determining which obligated parents now have a non-obligated spouse. The efficiencies gained in simply having a paragraph in the notice sent to all obligated parents of the potential for protecting a non-obligated spouse's share will inform the non-obligated spouse without imposing any additional costs on the State. This is the approach the State currently takes. The Court, therefore, holds that the notice given the non-obligated spouses satisfies due process.

### C. Hearing

The next due process consideration before the Court concerns the hearing procedures. Under the procedures used in 1983, an audit would be done if the obligated parent requested an investigation. Should the investigation not affect the intercept decision, the absent parent could request a hearing. This hearing was not held on the record nor did the hearing officer have the right to make a decision. That power stayed with defendant Hindman. Last, there was no explicit provision for judicial review.

By contrast, the new hearing procedures are much more protective of an individual's due process rights. Hearings are now held on the record and with an independent decisionmaker presiding. The right to judicial review in state family court is now explicit. A pre-hearing conference is held 24 to 36 hours after an inquiry is received, and a hearing is held within 45 days. Fox Aff.[19]

■ The constitutionality of pre-termination hearing procedures is, much like notice, dependent upon the particular circumstances. *Mathews v. Eldridge*, 424 U.S. at 319, 96 S.Ct. at 895. The government must accord a full, formal hearing before the deprivation is final, but this full hearing need not occur before the initial depriva-

tion. *See Mathews*, 424 U.S. at 349, 96 S.Ct. at 909. Although a full-fledged evidentiary hearing with virtually all the trappings of a judicial proceeding are usually not required before deprivation, some kind of opportunity to respond is generally required. *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 545, 105 S.Ct. 1487, 1495, 84 L.Ed.2d 494 (1984).

■ The Delaware system affords plaintiffs such an opportunity. Other courts that have ruled on the type of hearing required in TRIP programs have held that a pre-deprivation hearing is required before the refund can be intercepted. *See, e.g., Nelson*, 560 F.Supp. at 1109; *Marcello*, 574 F.Supp. at 597. Though the hearings contemplated in these cases did not reach the level of formality required in *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1969), the timing was all important. In *Nelson*, for example, the court held that the pre-deprivation procedure

> may take the form of an opportunity to submit documents which support the complainant's claim along with an opportunity to discuss the matter with an official. The hearing officer should submit a short statement of the reasons for the decision reached. Judicial review may be confined to the record. *Nelson*, 560 F.Supp. at 1108.

The *Nelson* court found that requiring the state to institute this review prior to termination would not impose an undue administrative burden on the state because the original notices are sent sufficiently in advance of the actual intercept to allow the state ample time to go through the hearing procedure. *Id.* at 1109. The Delaware system conforms with this approach.

In *McClelland v. Massigna*, 786 F.2d 1205 (4th Cir.1986), the court upheld the Maryland hearing procedure whereby an investigation and decision would be rendered within 30 days of an obligated parent's request, and if an individual still requested a later hearing, the officer must hold the hearing and reach a decision within 60 days

**19.** *See* n. 2, *supra.*

of the appeal. The Delaware system also results in obligated parents receiving a hearing within a finite period of time. Such a system satisfies due process.

### D. The Remedy for the Years 1984–1987

■ Because the present notice sent to obligated parents is invalid and notices given in past years were, if anything, less protective of plaintiffs' due process rights, the Court holds that plaintiffs' constitutional rights were violated in the years 1984 through 1987. At this point in time, the Court obviously cannot order the State to send pre-deprivation notices to the obligated parent plaintiffs for the past intercepts. The Court will thus take the approach taken in *Smith* and order the State to re-do hearings for the past years. 619 F.Supp. at 830; *see* discussion, *supra.* That remedy is the only remedy now feasible.[20]

■ With respect to the non-obligated spouses, the only relief this Court can give now is the same relief the obligated spouses receive: the opportunity to have the State hearing re-done. It is not the State's function to allocate a tax refund between the obligated and non-obligated spouse. Because it is the IRS that makes that determination and the IRS is not a defendant in this action, the Court can do nothing for the non-obligated spouses directly. As noted above, the present notice received by obligated spouses adequately protects the due process rights of non-obligated spouses.

CONCLUSION

The Court finds that the current state procedures violate the due process rights of the obligated parents because the procedure fails to inform the obligated individual of potential defenses. The Court does not find the present program to be clearly unconstitutional and will not hold the named defendants to be individually liable. More-

over, the defendants will not be liable for the 1983 violations because of the Eleventh Amendment. The State is liable for ongoing violations; however, and must send revised notices to obligated parents in the future. The State should submit a revised form of notice to the Court that includes the possible defenses. The State must also re-do the hearings for intercepts in tax years 1984–1987, if plaintiffs so desire.

An Order will enter in conformity with this Opinion.

---

20. The Court notes that plaintiffs initially asked for preliminary as well as permanent relief. The request for preliminary relief was never pursued and was eventually dropped altogether, thus putting the Court in the position of granting "prospective" relief for years that have already passed. The parties should determine which plaintiffs were subject to intercepts in which years, and the State should give new hearings accordingly.