*937
 
 ORDER
 

 ROSZKOWSKI, District Judge.
 

 This action comes before the court on the parties’ cross-motions for summary judgment. Each party contends that there is no genuine issue of material fact left to be decided and that their side is entitled to a judgment as a matter of law. The plaintiffs have filed memorandums and a Local Rule 12(e) statement in support of its motions. The defendant has filed memorandums and both 12(e) and 12(f) statements. For the reasons set forth below, the court grants the plaintiffs Wagner, Hampton, Owens, Petters, Dennis, and Brown prospective injunctive relief from future violations of the aforementioned plaintiff’s due process right. The defendant is entitled to judgment on all other claims.
 

 NATURE OF THE CASE
 

 The eighteen plaintiffs are suing the Illinois State Director of the Illinois Department of Public Aid (“IDPA”), Edward T. Duffy, for violating their constitutional right to procedural due process. The plaintiffs contend that their Fourteenth Amendment rights were violated when the plaintiff authorized the interception of the defendants’ 1984 and/or 1985 state and/or federal tax refunds pursuant to the “Child Support and Establishment of Paternity Program” in Title IV-D of the Social Security Act (Social Services Amendments of 1974, Pub.L. No. 93-647, 101(a)
 
 et seq.
 
 (1975)), 42 U.S.C. § 651
 
 et seq.
 
 (1988 West Supp.).
 
 [1]
 
 The intercepted refunds were to be used to satisfy advances made by the Illinois Department of Public Aid (“IDPA”) to families waiting for past due child support payments. In their prayer for relief, the plaintiffs seek declaratory, injunctive, and compensatory relief.
 

 DISCUSSION
 

 The parties have argued a number of issues through the course of briefing their cross-motions. Several of these issues are no longer contested. The plaintiffs first concede that the Eleventh Amendment prohibits the recovery of damages or any retroactive relief
 
 (e.g.,
 
 declaratory, injunctive) from the defendant. The plaintiffs further concede in their briefs that their state law claims were prohibited by the Eleventh Amendment and additionally were duplica-tive of their federal causes of action.
 
 (See
 
 Plaintiff’s Reply Brief in Opposition to Defendant’s Cross motion for Summary Judgment, pp. 8-9).
 

 The plaintiffs additionally admit that they have not met the technical requirements for pleading a violation of the Due Process Clause of the Fourteenth Amendment and the Social Security Act in counts I and II, respectively. The plaintiffs, however, insist that dismissing Counts I and II now would only serve to delay the ultimate resolution of the issues and ask that the counts conform to the proof. On this score, the court agrees with the plaintiffs and allows Counts I and II to stand.
 

 I. THRESHOLD ISSUES
 

 There are still critical threshold issues that must be entertained in order to determine whether any of the “core” due process issues even need be addressed.
 

 Retroactive v. Prospective Relief
 

 While the plaintiffs have conceded that the Eleventh Amendment bars retroactive relief and in particular any “refund with interest;” they still maintain that declaratory and injunctive relief is still available with regard to the 1985 tax intercepts. The plaintiffs cite the case of
 
 Brown v. Eichler,
 
 664 F.Supp. 865, 875-76 (D.Del.1987), for the proposition that injunctive “remedies sought for all the intercepts effected subsequent to the complaint’s filing should be viewed as prospective relief.” Thus, the plaintiffs reason that the court in the instant case could order the state to re-do the post-complaint administrative hearings to comply with due process, since “the original complaint was filed in October 1986 — well before the previously requested
 
 *938
 
 administrative reviews [for the 1985 intercepts] were completed.” (Plaintiffs’ Reply Brief in Opposition to Defendant’s Cross Motion for Summary Judgment, p. 7).
 

 The plaintiffs’ conclusion, however, does not follow from Brown’s holding. The key time reference in
 
 Brown
 
 was when the intercept was effected not when “administrative reviews were completed.” The time an administrative review is completed is of no relevance to the determination of whether relief is prospective or retroactive. Simply, if a complaint requesting equitable relief is filed before the tax intercept — the deprivation,
 
 [2]
 
 then the plaintiff is seeking prospective relief, even if the court acts after the deprivation. If the complaint is filed after the deprivation, then curing the deprivation is retroactive relief.
 

 In the instant case, the interception of the plaintiffs’ 1984 and 1985 refunds were routinely performed sometime in the spring or summer of 1985 or 1986, respectively— well before the filing of the complaint in October of 1986. (Defendant Duffy’s Statement of Material Facts as to Which There is No Genuine Issue, pp. 12-30). Thus, any injunctive or declaratory relief relating to the 1984 or 1985 tax intercepts or their corresponding administrative hearings would be retroactive and necessarily prohibited by the Eleventh Amendment. Accordingly, the court is unable to grant any retroactive declaratory or injunctive relief with regards to the interception of the plaintiffs’ 1984 or 1985 tax refunds.
 

 Prospective Relief (“Standing”)
 

 The defendant next argues that the plaintiffs are not entitled to any prospective relief since they lack the requisite “continuing harm” to invoke the Article III jurisdiction of the district court. The defendant continues that there is no “case” before the court since the plaintiffs’ are no longer subject to an interception of their tax refunds.
 

 It is well settled law that in requesting prospective relief a plaintiff must demonstrate that “he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury must be both real and immediate, not ‘conjectural’ or ‘hypothetical’.”
 
 City of Los Angeles v. Lyons,
 
 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983). Further, past violations do not, in themselves, amount to that real and immediate threat of injury necessary to make out a “case or controversy.”
 
 O’Shea v. Littleton,
 
 414 U.S. 488, 495-496, 94 S.Ct. 669, 675-76, 38 L.Ed.2d 674 (1974).
 

 The Supreme Court’s decision in,
 
 City of Los Angeles v. Lyons, supra,
 
 fleshes out the standing requirements for requesting prospective relief. In
 
 Lyons,
 
 the plaintiff requested prospective injunctive relief prohibiting the Los Angeles Police Department from employing a chokehold against suspects that were not trying to resist arrest or escape. The Court found that with regard to granting such injunctive relief the plaintiff failed to show the existence of a present “case or controversy” and therefore lacked standing to request prospective injunctive relief. In deciding, the
 
 Lyons
 
 court held the following:
 

 Lyons has failed to demonstrate a case or controversy with the City that would justify the equitable relief sought. Lyons’ standing to seek the injunction requested depended on whether he was likely to suffer future injury from use of the chokeholds by police officers. ******
 

 That Lyons may have been illegally choked by the police on October 6, 1976, while presumably affording Lyons standing to claim damages against the individual officers and perhaps against the City, does nothing to establish a real and immediate threat that he would again be stopped for a traffic violation or for any other offense, by an officer or officers’ who would illegally choke him into unconsciousness without any provocation or resistance on his part.
 

 ******
 
 *939
 
 In order to etablish an actual controversy-in this case, Lyons would have had not only to allege that he would have another encounter with the police but also to make the incredible assertion either (1) that all police officers in Los Angeles always choke any citizen with whom they happen to have an encounter, whether for the purpose of arrest, issuing a citation, or for questioning, or (2) that the City ordered or authorized police officers to act in such a manner.
 

 Lyons,
 
 461 U.S. at 105-06, 103 S.Ct. at 1667-68.
 

 The
 
 Lyons
 
 court also made a critical distinction between the often confused issues of “standing” and “mootness.”
 

 The issue here is not whether that claim is moot but whether Lyons meets the preconditions for asserting an injunction claim in a federal forum .... for Lyon’s lack of standing does not rest on the termination of the police practice but on the speculative nature of his claim that he will again experience injury as the result of that practice even if continued.
 

 Lyons,
 
 414 U.S. at 109, 103 S.Ct. at 1669.
 

 In sum, the Lyons’ court was not concerned with whether the police department had changed its previous policy on choke-holds potentially mooting Lyons’ claim; rather, only with whether Lyons could make a showing that he is realistically threatened by a repetition of his experiences of October 1976.
 

 In the instant case, however, the defendant contends both that the 1988 amendments to the intercept enforcement regulations moot the plaintiffs’ claims and that a repetition of circumstances surrounding the 1984 and 1985 intercepts of plaintiff’s tax refunds is too speculative to give rise to a justiciable claim for prospective relief. With respect to standing, other jurisdictions have distinguished the standing of certain tax intercept plaintiffs from the plaintiff in
 
 Lyons.
 

 In
 
 Brown v. Eichler, supra,
 
 the court held that three plaintiffs in a tax intercept case had standing to request prospective injunctive relief. The plaintiffs were no longer subject to a tax-intercept, but the
 
 Brown
 
 court found that there was a genuine likelihood that the plaintiffs would suffer the same harm in the future. Specifically, the
 
 Brown
 
 court found the following:
 

 As of now, Whitlow, Walton, and Hall still owe support money to the state, (citations omitted). They stand in a position where there is a reasonable likelihood of suffering the same harm in the future. Moreover, this Court’s award of injunctive relief will have a direct effect on ensuring that the plaintiffs will not suffer the complained of harm, (citations omitted). In terms of prospective injunctive relief, some of the plaintiffs have satisfied the standing requirements.
 

 Brown,
 
 664 F.Supp. at 871.
 
 See also Coughlin v. Regan,
 
 584 F.Supp. 697, 702 n. 11 (D.Me.1984),
 
 aff'd on other grounds,
 
 768 F.2d 468 (1st Cir.1985), (reasonable to expect future interception of non-obligated spouse’s income if the obligated spouse is still in arrearage);
 
 cf. Runkle v. Cohen,
 
 666 F.Supp. 700, 702 (M.D.Penn.1986), (summarily dismissed as speculative any likelihood that the plaintiff would be subject to the tax intercept program in the future, however, primarily relied on the mootness of the plaintiff’s claim since the complained-about procedures were no longer in force).
 

 The critical inquiry in the instant case, as outlined in
 
 Lyons
 
 and
 
 Brown,
 
 is whether there is a genuine likelihood that the plaintiffs will suffer the same harm in the future. The court finds that there is a genuine likelihood that some of plaintiffs will be subject to the Illinois tax-intercept program in the future and hence suffer the same harm. First, all the plaintiffs are, or were, judgment debtors in the sense that they are, or were, under court order to fulfill certain pecuniary obligations. Second, several of the plaintiffs are delinquent in satisfying their obligations. Wagner, Hampton, Owens, Petters, Martin, Dennis, and Brown have been adjudged by the IDPA to be in arrearage in their child support payments. (Defendant’s 12(e) Statement ¶¶ 36-37, 44-45, 46-47, 48-50, 59-62, 72-73, Exhibits E, Q, S, T, Y, DD, EE, FF, XX). Third, according to the announced state and federal
 
 *940
 
 intercept criteria of the IDPA, Wagner, Hampton, Owens, Petters, Dennis and Brown are sufficiently in arrearage to trigger the Department’s intercept machinery.
 
 Id.;
 
 89 Ill.Admin. Ch. I, §§ 160.-70(c)(2)(A)(B) (1986). Moreover, as of the fall of 1987 the IDPA explicitly stated that they may request the future interception of Dennis and Petters’s 1987 state and federal tax refunds. (Defendant’s 12(e) Statement, TT1Í 50, 61).
 

 These plaintiffs, unlike the plaintiff in
 
 Lyons
 
 and like the plaintiff in
 
 Brown,
 
 are in nearly the same position that precipitated their earlier encounter with the allegedly unconstitutional enforcement procedures. As the
 
 Lyons
 
 court stated, Lyons would have had to allege that (1) he would have another encounter with the police and that (2) the police, by city edict or otherwise, would choke him.
 
 Lyons,
 
 461 U.S. at 106, 103 S.Ct. at 1668. The plaintiff in
 
 Lyons,
 
 however, failed to demonstrate why it is likely that either event, let alone both, would occur. Conversely, several of the plaintiffs in the instant case have demonstrated that they are family support obli-gors with arrearages in child support that meet the eligibility criteria for a tax refund intercept. It is reasonably likely that Wagner, Hampton, Owens, Petters, Dennis and Brown, all judgment debtors with arrearag-es above the intercept criteria, will be subjected to an intercept enforcement procedure in the future. Accordingly, these plaintiffs have standing to seek prospective injunctive relief.
 

 The rest of the plaintiffs, however, lack standing to bring a claim for prospective injunctive relief. These plaintiffs’ chances of encountering a repetition of past harm are more similar to the plaintiff in
 
 Lyons
 
 than their aforementioned fellow plaintiffs. While some of the remaining plaintiffs are still subject to support obligations, they do not otherwise meet the Department’s eligibility criteria; therefore, there is no reason to suspect that the Department would request the intercept of these plaintiffs’ refunds in the future. (See Defendant’s 12(e) ¶¶ 3-72). Moreover, the court will not presume arrearages in support payments in the future.
 
 See O’Shea,
 
 414 U.S. at 497, 94 S.Ct. at 677.
 
 Runkle,
 
 666 F.Supp. at 702.
 
 Mootness
 

 The plaintiffs contend that many, if not all, of the plaintiff’s allegations have been mooted by the recent May 16, 1988 amendments to the “Enforcement of Child Support Orders” regulations. 89 Ill.Reg. Sub-part D § 160.70. In a situation where the plaintiffs pray for prospective injunctive relief, their claims may be mooted if the constitutionally violative behavior has already been remedied.
 
 See Metcalf v. Trainor,
 
 472 F.Supp. 576, 577-78 (N.D.Ill.1979). This mootness determination cannot be made before the court first ascertains whether the new enforcement procedures meet due process requirements. If the new procedures are constitutionally sound, then the claims are moot. If not, the plaintiff’s claims remain viable.
 

 II. PROCEDURAL DUE PROCESS
 

 Before proceeding with our due process inquiry, a brief overview of the complained-about procedures complete with amendments is necessary. The tax intercept program is part of the “Child Support and Establishment of Paternity Program” (“Act”). 42 U.S.C. § 651
 
 et seq.
 
 The tax intercept program is a cooperative effort between the federal government and participating state governments to better enforce the payment of child support obligations. The participating states are responsible for establishing a plan to effectuate the aims of the “Act.”
 

 In Illinois, the IDPA is empowered by state statute to obtain support obligations and recover the public aid provided recipients. Ill.Rev.Stat., Ch. 23, ¶¶ 10-1, 10-10 (1985). The IDPA has promulgated administrative regulations that set up the relevant enforcement procedures in 89 Ill.Admin., Ch. I, § 160.70
 
 et seq.
 
 (1986). The Bureau of Child Support Enforcement (“BCSE”), a subordinate agency within the IDPA, administers the intercept program. III.Rev.Stat., Ch. 23 ¶ 10-3.1 (1983). The BCSE certifies a list of names and amounts to the Secretary of the Treasury and/or the State Comptroller for the recovery of past
 
 *941
 
 due support owed by “responsible relatives.” Prior to submitting the past due amount to the Secretary or the Comptroller, the BCSE notifies the support obligor of the impending interception. 89 Ill.Admin., Ch. I, § 160.70(c)(3), 42 U.S.C. § 664(a)(3)(A).
 

 This initial notice as recently amended contains in relevant part: (1) the obligors name and case number (2) amount of past due support which will be submitted for intercept and (3) the right to contest the determination that past due support is owed and the amount of the arrearage by requesting a redetermination. § 160.70(c)(3). If the alleged obligor pays his past due amount by the due date on his initial notice, then, the obligor’s name will be deleted from the certification list. (Defendant’s 12(e) Statement, 1111). If an alleged obligor requests a redetermination, then the Special Functions Unit (“SFU”) of the BCSE would administer the review process. (Defendant’s 12(e) Statement, U 27). Of the six plaintiffs with standing, all but Brown and Dennis requested a review. Brown and Dennis, however, requested a review of their
 
 1986
 
 tax refund interception. (Defendant’s 12(e) Statement if 59, 72). The review consists of a “family support specialist” auditing the past due determination by completing a redetermination worksheet and inspecting the obligor’s case file. (Defendant’s 12(e) Statement, 111128, 29). After initially reviewing an obligor’s case file, an acknowledgement is sent to the obligors. Sometimes the SFU also requests more information from the obligor depending on the state of the obligor’s case file. (Defendant’s 12(e), 11 29).
 

 In 1985 and early 1986, these administrative reviews routinely required more than six months to complete. (Defendant’s 12(e) Statement, ¶ 29). Of the plaintiff’s requesting review, none received a decision or an opportunity for hearing before the seizure of their refunds. (Defendant’s 12(e) Statement, 1136-72).
 

 In 1985 and up until July of 1986, there were no written procedures for administrative review. Nor did there exist any written provisions for an administrative hearing or judicial review. In July of 1986, the Illinois administrative regulations [89 Ill. Admin.Code Ch. I., 160.70
 
 et seq.]
 
 enforcing the intercept program were amended. (Defendant’s 12(f), 1115). According to the amendments, the BCSE shall inform the “responsible relative” of the results of the administrative review and the right to contest the results by requesting within 30 days an administrative hearing. 89 Ill. Adm., Ch. I, 160 70(c)(14).
 

 As noted above, the enforcement regulations were amended again in 1988. These amendments provide that “[a] request for a redetermination made within 30 days from the date of mailing of the advance notice shall stay the department from submitting the past due amount from the controller.” § 160.70.4. Also according to the new 1988 amendments, “no later than 120 days after the date the redetermination was requested, the Department shall provide the responsible relative with a notice of the results of the redetermination and of the right to contest such results by requesting a hearing by the Department within 30 days from the date of the mailing of the notice." Section 160.70(c)(5). After a hearing request has been made, the IDPA shall conduct a hearing pursuant to 89 Ill.Admin., Ch. I, 104.103 (1986). Under federal law and state regulations, after the IRS withholds a tax refund, it sends a notice of the withholding to the obligor. The IRS then transfers the refund to the State. 26 U.S.C. § 6402(c); Section 160.70(c)(3).
 

 The plaintiffs aver that these enforcement procedures employed by the IDPA are constitutionally deficient.
 
 [3]
 
 In particular, the plaintiffs charge that the original notice provided by the defendant is inadequate due primarily to the absence of possible defenses available to the plaintiffs.
 
 [4]
 
 
 *942
 
 The plaintiffs also dispute the constitutionality of the timing and form of the hearing provided by the IDPA.
 

 In order to prove a due process violation, the plaintiffs must establish the existence of a property interest, and that they were deprived of the property interest without the procedural protection mandated by the fourteenth amendment. (U.S. Const, amend XIV, § 1).
 

 In the case at bar, the first step is simple. There can be little doubt that a citizen has a property interest in his or her tax refund, which is in reality withheld wages.
 
 See Sniadach v. Family Finance Corp.,
 
 395 U.S. 337, 340, 89 S.Ct. 1820, 1822, 23 L.Ed.2d 349 (1969) (wages are a special type of property);
 
 Toney v. Burris,
 
 650 F.Supp. 1227, 1234 (N.D.Ill.1986),
 
 reversed,
 
 829 F.2d 622 (failure of district court to take into account new amendments). The next more difficult step is whether the IDPA provided the plaintiffs with due process before depriving them of their tax refund.
 

 Notice
 

 The court will consider the notice and hearing aspects of the IDPA procedure separately. The Supreme Court’s decision in
 
 Mullane v. Central Hanover Trust Co.,
 
 339 U.S. 306, 314 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950), sets out the fundamental due process requirements for notice.
 

 “Notice should be reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the actions and afford them the opportunity to present their objections.”
 
 Mullane,
 
 339 U.S. at 314, 70 S.Ct. at 657. This language has led due process to require notices to include the availability of procedures for challenging the intended government action.
 
 Memphis Light, Gas & Water Div. v. Craft,
 
 436 U.S. 1, 15, 98 S.Ct. 1554, 1563, 56 L.Ed.2d 30 (1978). The
 
 Memphis
 
 court emphasized that the presence of unsophisticated recipients necessitated the inclusion in the notice of the available procedures to challenge the deprivation. This development in
 
 Memphis Light
 
 logically required due process, in some circumstances, to include the defenses available to the challenged action to assure the available procedures and hence notice remained meaningful.
 
 See, Brown v. Eichler, supra, Nelson v. Regan,
 
 560 F.Supp. 1101 (D.Conn.1983),
 
 affd.,
 
 731 F.2d 105 (2d Cir.),
 
 cert. denied, sub nom. Manning v. Nelsen,
 
 469 U.S. 853, 105 S.Ct. 175, 83 L.Ed.2d 110 (1984);
 
 Fineberg v. Sullivan,
 
 634 F.2d 50 (3rd Cir.1980).
 

 In
 
 Finberg, supra,
 
 the court applying the principles of
 
 Mullane
 
 and
 
 Memphis Light
 
 found that a judgment debtor subject to a garnishment of her bank accounts was entitled to a notice that included information on exemptions to garnishment. The
 
 Finberg
 
 court stressed that including the information on exemptions afforded interested parties an opportunity to present their objections. Without the exemption included, “[kjnowledge of these exemptions is not widespread, and a judgment debtor may not be able to consult a lawyer before the freeze on a bank account begins to cause serious hardships.”
 
 Finberg,
 
 634 F.Supp. at 62. In addition, the
 
 Finberg
 
 court noted that the exemption notice could be included in a copy of the writ of execution at little extra expense of time and money.
 
 Finberg,
 
 634 F.2d at 50.
 

 Cases involving tax intercepts have also found the due process clause to necessitate the inclusion of available defenses in a notice of impending government action. In
 
 Nelson v. Regan, supra,
 
 the court used the logic of
 
 Memphis Light
 
 and
 
 Fineberg
 
 when deciding:
 

 
 *943
 
 Recently, the court in
 
 Brown v. Eickler, supra,
 
 citing the same cases and rationale cited above found that “[i]n order for these [unsophisticated] people to understand that the intercept is not a
 
 fait accompli,
 
 they need to know more than that they can contest the determination that past due support is owed. These individuals need to understand what defenses are available if they are to believe that the right to review is a right worth exercising.”
 
 Brown,
 
 664 F.Supp.^at 878. The
 
 Brown
 
 court also emphasised the small added burden involved in adding the defenses to the notice; a one-time cost of rewriting the notice compared to the great benefit of reducing the risk of an erroneous deprivation.
 
 Brown,
 
 664 F.Supp. 865 (D.Del.1987).
 
 See also Marcello v. Regan,
 
 574 F.Supp. 586, 598-99 (D.R.I.1983) (ordered, in this tax intercept case, that due process required a notice informing obligors of their right to an administrative hearing and to judicial review, and further, advising them of the general nature of potential defenses including: lack of requisite assignment under 42 U.S.C. § 602(a)(26)(A), absence of a court order for support, discharge in bankruptcy applicable to the support obligor, mistaken identity, and/or inaccuracy in the amount of past due support asserted).
 

 
 *942
 
 “Others, especially when they are relatively uneducated and uninformed about their legal rights, may feel quite helpless when told that their refunds will be intercepted. A clear and detailed predeprivation notification, specifying the possible defenses and the procedures for asserting those defenses, is necessary to afford due process protection to these individuals.”
 
 Nelson,
 
 560 F.Supp. at 1107.
 

 
 *943
 
 The bottom line to the preceding decisions is that notice that merely apprises the obligor of the pending intercept is not enough. A meaningful notice must edify the receiver sufficiently so that he or she will have an opportunity to respond to the government action. While some would argue that the decisions quoted above have tortured the notice requirement in
 
 Mul-lane,
 
 the reality is that the intercept of a person’s wages can be both a frustrating and befuddling experience. It is reasonable to presume that an obligor may be unaware of defenses to the intercept.
 

 The notice mandated by the Illinois Administrative Code, as amended in May 1988, informs obligors of the amount of past due support owed and their ability to contest either the amount owed or whether any amount is owed at all, but the notice does not explain what defenses are available to challenge the intercept.
 

 Without more, the notice fails to fulfill its essential purpose of assuring the obli-gors of a meaningful chance to respond to the government’s action before a deprivation occurs. If the plaintiffs in the instant case were apprised of the defenses available, erroneous deprivations could have been avoided. Moreover, the plaintiffs in the instant case, like the plaintiffs in
 
 Nelson, Brown
 
 and
 
 Finberg
 
 do not demonstrate any special acumen for defending against the enforcement procedures of IDPA. This court also agrees with the courts in
 
 Nelson, Finberg
 
 and
 
 Brown
 
 that the added expense of including defenses is minimal compared to the added benefit.
 

 The court finds that due process requires the IDPA’s pre-intercept notice to contain a list of common defenses to the challenged action.
 

 Hearing
 

 The next inquiry is whether the timing and form of the IDPA’s hearing comports with procedural due process. It is settled constitutional jurisprudence that before being deprived of a property interest, the interest holder must be afforded an opportunity to be heard at a meaningful time in a meaningful manner.
 
 Mathews v. Eldridge,
 
 424 U.S. 319, 333, 96 S.Ct. 893, 901, 47 L.Ed.2d 18 (1976) (quoting
 
 Armstrong v. Manzo,
 
 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965)). The Supreme Court in
 
 Mathews v. Eldridge, supra,
 
 laid out three factors to be considered when determining the timing and form a hearing shall take:
 

 First, the private interest that will be affected by the official action, second, the risk of an erroneous deprivation through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government’s interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
 

 Mathews,
 
 424 U.S. at 335, 96 S.Ct. at 903.
 

 Superimposed upon the
 
 Mathews
 
 three factor test is the general axiom “that ab
 
 *944
 
 sent an ‘extraordinary situation’ the power of the state to seize a person’s property may not be invoked without prior judicial determination that the seizure is justified.”
 
 United States v. $8,850,
 
 461 U.S.
 
 555, 562,
 
 n. 12, 103 S.Ct. 2005, 2011 n. 12, 76 L.Ed.2d 143 (1983);
 
 Miller v. City of Chicago,
 
 774 F.2d 188, 191 (7th Cir.1985)
 
 cert. denied.
 
 476 U.S. 1105, 106 S.Ct. 1949, 90 L.Ed.2d 358 (1986). “Pre-deprivation notice and hearing represent the norm and the state must forward important reasons to justify a departure therefrom.”
 
 Miller,
 
 774 F.2d at 191. These “extraordinary situations” are usually one of the following; an immediate public danger exists,
 
 [5]
 
 an economic emergency,
 
 [6]
 
 and where scheduling a deprivation hearing is impractical because of the random or unauthorized actions of state actors.
 
 [7]
 

 Other federal courts have grappled with the same issue before the court. While the procedures and facts surrounding these other decisions are different, the various decisions are instructive and merit review.
 

 In
 
 Nelson v. Regan, supra,
 
 the challenged procedures made no provision for a mechanism on which to challenge the state’s claim to a tax refund.
 
 Nelson,
 
 560 F.Supp. at 1106. Applying the
 
 Mathews
 
 factors, the
 
 Nelson
 
 court found the factors favored a pre-deprivation hearing. The
 
 Nelson
 
 court held that the interest of the plaintiff in receiving his tax refund outweighs the state’s interest in receiving the money it is owed.
 
 Nelson,
 
 560 F.Supp. at 1108. Therefore, the court concluded a pre-deprivation hearing was necessary. Because the
 
 Nelson
 
 court viewed as dispos-itive the balancing of the private and public interest, the court only cursorily noted that the new procedural safeguards would provide some benefit.
 
 Nelson,
 
 560 F.Supp. at 1109 n. 10. Accordingly, the
 
 Nelson
 
 court ordered: a pre-deprivational administrative review with an official with the authority to remove names from the list certified to the IRS. The review need not be a full hearing but the complainant can appear personally and present documentary evidence. The official’s decision must be judicially reviewable but not necessarily before the refunds are intercepted.
 
 Nelson,
 
 560 F.Supp. at 1111.
 

 Next, in
 
 Marcello v. Regan, supra,
 
 the “challenged” procedure consisted entirely of an audit of a complainant’s records; no other opportunity to challenge the intercept was available. Applying the
 
 Mathews
 
 standard, the
 
 Marcello
 
 court first found the private interest of the complainant to be significant. “It is beyond cavil that many persons perodically plan for and rely on the certainty of a refund and often commit the entire amount well before it is received.”
 
 Marcello,
 
 574 F.Supp. at 596. Second, the risk of an erroneous deprivation through current procedures was substantial, since there was no opportunity to protest an interception before it was accomplished except through the government’s perfunctory review, leading the
 
 Marcello
 
 court to reason that additional safeguards would be valuable.
 
 Marcello,
 
 574 F.Supp. at 596-97.
 

 The
 
 Marcello
 
 court also recognized the “undeniably significant” interest of the state government in receiving the money it is owed. “In an era when both parental and hymenal responsibility has been eroded and when there is all too little reluctance to permit government to shoulder one’s rightful burdens, the public’s stake in the objectives of the intercept paradigm is manifest.”
 
 Marcello,
 
 574 F.Supp. at 597. The court, however, concluded that the various factors could be reconciled.
 
 Marcello,
 
 574 F.Supp. at 597.
 

 The
 
 Marcello
 
 court, finding no “extraordinary circumstances present”, ordered a pre-deprivational hearing: “The hearing shall consist of a structured meeting between the complainant and a government official with the authority to take meaningful actions.”
 
 Marcello,
 
 574 F.Supp. at 599.
 
 *945
 
 The court added that written submission of objections alone would be inadequate due to the probable low educational background and
 
 pro se
 
 nature of the complainants.
 

 Marcello,
 
 574 F.Supp. at 599.
 

 In
 
 McClelland v. Messinger,
 
 786 F.2d 1205 (4th Cir.1986), the Fourth Circuit upheld challenged intercept procedures. The
 
 McClelland
 
 court relied heavily on
 
 Mathews v. Eldridge, supra,
 
 and
 
 Cleveland Bd. of Education v. Loudermill,
 
 470 U.S. 532, 105 S.Ct.1487, 84 L.Ed.2d 494 (1984), while distinguishing
 
 Nelson v. Regan, supra,
 
 and
 
 Marcello v. Regan, supra.
 
 The
 
 McClelland
 
 court de-emphasized the private interest of the complainant by contrasting his interest in his tax refund with the greater interest of welfare recipients in
 
 Goldberg v. Kelly,
 
 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) and comparing his interest to the relatively lesser interest of the “disability recipients” in
 
 Mathews.
 

 The
 
 McClelland
 
 court next found that the interest and procedures available in its case was similar to the interest and procedures discussed in
 
 Loudermill.
 
 The
 
 McClelland
 
 court then reasoned “it is unnecessary to provide a party with a pre-deprivation administrative hearing, if there is some informal procedure such as an op-portunnity to complain, available before deprivation, though an actual hearing is delayed until after termination.”
 
 McClelland,
 
 786 F.2d at 1213. Accordingly, the
 
 McClelland
 
 court found the existing state procedures of a pre-intercept “investigation” and an immediate post-intercept administrative hearing followed by judicial review comported with procedural due process.
 

 Finally, in
 
 Toney v. Burris, supra,
 
 a case challenging the constitutionality of procedures allowing the state to garnish wages to offset indebtedness to the State, the court examined tax-intercept cases and applied their reasoning to the analogous garnishment proceeding for post-judgment debtors. The
 
 Toney
 
 court, after analyzing the intercept cases with the
 
 Mathews
 
 factors, found the following:
 

 As to those class members whose underlying debts have been previously determined by a court judgment, less extensive pre-withholding process is acceptable. Since the defenses to the underlying debt have already been heard and decided, there is less risk of an erroneous withholding. Nevertheless, as is implicit in cases like
 
 Nelson
 
 and
 
 Marcello,
 
 since there are defenses to the current collecti-bility of the claimed arrearage, i.e., mistaken identity, mistaken calculations, bankruptcy, these debtors must still be given some pre-withholding opportunity to present into a record written objections to the state’s evidence for withh-holding and receive a decision from an impartial officer. If no more extensive process than this is provided, then
 
 Loud-ermill
 
 demands that this streamlined prewithholding process be supplemented by a prompt, plenary post-withhholding hearing followed by the availability of judicial review.
 

 Toney,
 
 650 F.Supp. at 1243.
 

 In sum, these cases suggest the following: At a minimum, a judgment debtor must have some pre-deprivational opportunity to respond to the threatened government action by appealing to an official who has the authority to delete the complainant’s name from the intercept list. This opportunity to respond must be on the record and judicially reviewable but not necessarily before the deprivation. The official’s decision on the complainant’s challenge must be received by the complainant before the refund is intercepted. Finally, the complainant is entitled to a full administrative hearing subject to judicial review.
 

 It is safe to say that the originally complained about pre-amendment enforcement procedures, codified in 89 Ill.Admin.Code Chap. I, § 160.70
 
 et seq.,
 
 do not meet the constitutional standards suggested by prior case law or the court’s own application of the
 
 Mathews
 
 factors.
 

 Like the others before it, this court finds that the obligor’s interest in their tax refund to be significant. Likewise, the court finds the chances of erroneous deprivations great in the state’s prior enforcement procedures. Specifically, after receiving an initial notice of an impending intercept, the
 
 *946
 
 obligor could have contested the amount of his arrearage with the SFU. However, the SFU often took several months to complete an initial review of the obligor’s records and then would only return an acknowl-edgement of receipt of the objections to the obligor. The SFU would then commence a full review of the record, a review that was not set on any time table and often required over 6 months to complete. Meanwhile, the obligor’s tax refunds could have been withheld by the IRS and/or Comptroller and transferred to the IDPA. In short, obligors were guaranteed no opporturnity to challenge the intercept prior to its completion. Even SFU’s initial audit may not have been completed before the interception.
 

 With this almost entirely unchecked ability to intercept an obligor’s tax refund, the chances of erroneous deprivations was great. Indeed, fourteen of the eighteen original plaintiffs eventually had their ar-rearage figure lessened from the amount depicted on the original notice. In turn, it is manifest that additional safeguards would have benefited the enforcement procedure. An adequate opportunity to be heard before a deprivation would have reduced the risk of unwarranted intercepts.
 

 As for the third
 
 Mathews
 
 factor, the court finds that the government has a legitimate interest in collecting its past due debts. However, the necessity of the government receiving its funds before a hearing is not readily apparent.
 
 See To-ney,
 
 650 F.Supp. 1227.
 

 Additionally, the tax intercept program does not involve an economic, military or public health emergency nor is an intercept an unpredictable or unauthorized event. Thus, there is no further reason to delay the obligor’s opportunity to respond.
 

 In contrast to the originally complained about procedures, the newly amended intercept enforcement procedures do meet the constitutional standards suggested by prior case law and the
 
 Mathews
 
 factor.
 

 The new amendments provide a complainant with a guaranteed pre-intercept opportunity to respond to the government’s actions. The intercept is stayed if the original notice is responded to within 30 days by a request for a redetermination. Thereafter, the Department must rule on the redetermination within 120 days of the initial request. This notice, containing the results of the redetermination, also informs the complainant of the opportunity to request within 30 days a hearing which shall proceed according to 89 Ill.Adm.Code 104.-103.
 
 [8]
 

 In sum, the new amendments allay the plaintiff’s fear of being locked out of presenting pre-intercept objections and receiving a decision on these objections before the intercept. These amendment procedures, unlike the prior procedures, provide a pre-deprivation opportunity to be heard and, consequently, are not violative of constitutional requirements. Accordingly, the plaintiffs’ due process claims with regard to the time and form of the Depart-
 
 *947
 
 meat’s hearings have been mooted by the 1988 amendments.
 

 Class-Wide Relief
 

 A continuing dispute between the parties that now needs to be addressed is the issue of class-wide relief. The plaintiffs argue that, despite the fact that no class was certified in this case pursuant to Fed.R. Civ.P. 23, the nature of the plaintiffs’ claims automatically garner class-wide relief. Conversely, the defendants claim that without certifying a class the plaintiffs alone are entitled to relief.
 

 The plaintiffs buttress their request for class-wide relief by citing a case that suggests a court may deny certification of a class if there is “no need.” The case cited
 
 Alliance to End Repression v. Rockford,
 
 565 F.2d 975 (7th Cir.1977), however, affirms the lower court’s certification of a class action. Only in dicta, does the
 
 Rockford
 
 court ruminate that: “it is important to note whether the suit is attacking a statute or regulation as being facially unconstitutional. If so, then there would appear to be little need for the suit to proceed as a class action.”
 
 Rockford,
 
 565 F.2d at 980. Notwithstanding the
 
 Rockford
 
 court’s remarks, it is well settled in the Seventh Circuit that a court cannot deny class certification on the basis of “no need.”
 
 See Fujushima v. Board of Education,
 
 460 F.2d 1355, 1360 (7th Cir.1972);
 
 Vergara v. Hampton,
 
 581 F.2d 1281, 1284 (7th Cir.1978);
 
 Vickers v. Trainor,
 
 546 F.2d 739, 747 (7th Cir.1976);
 
 Borowski v. City of Burbank,
 
 101 F.R.D. 59, 62 (N.D.Ill.1984);
 
 Brown v. Scott,
 
 602 F.2d 791, 795 (7th Cir.1979). Furthermore, it is important to distinguish what the
 
 Rockford
 
 court meant by the term “no need.” The
 
 Rockford
 
 court reveals its intent in the following passage: “it can be assumed that if the court declares the statute or regulation unconstitutional then the responsible government officials will discontinue the statutes enforcement.” It appears from this language that the
 
 Rockford
 
 court was referring to “no need” for class certification as a practical matter as opposed to legal matter. Thus, according to the
 
 Rockford
 
 and accompanying decisions, a plaintiff’s class is entitled to certification even if it is perceived to be unneccessary from a practical standpoint.
 

 The inverse of the situation in
 
 Rockford
 
 now faces the court. Instead of requesting class certification, the plaintiff eschewed certification believing there was “no need” as a matter of law for class certification in order to achieve class-wide relief.
 

 As a practical matter, the plaintiff is correct. By the court finding that the notice regulations are constitutionally infirm, a responsible administrator would presumably no longer pursue the unconstitutional course of action against any individuals. The query is, however, whether the plaintiffs may achieve class-wide relief as a legal matter. In other words, is the court obliged to order relief to all similarly situated persons, as opposed to the defendant’s own internal motivation to right any constitutional infirmities.
 

 On this theme, the defendants cite
 
 Zepeda v. United States,
 
 753 F.2d 719 (9th Cir.1983). The
 
 Zepeda
 
 court in a well reasoned footnote reconciled the legal precedent finding class certification unnecessary to procure “class-wide” relief and the line of cases requiring class certification to obtain “class-wide” relief.
 

 The
 
 Zepeda
 
 court first emphasized the strictures of granting class-wide relief:
 

 Without a properly certified class, a court cannot grant relief on a class-wide basis [citations omitted].
 

 This limitation is consistent with the traditional rule that injunctive relief should be narrowly tailored to remedy the specific harms shown by the plaintiffs, “rather than to ‘enjoin all possible breaches of law.’ [citations omitted]. An injunction should be no more burdensome to the defendant then necessary to provide complete relief to plaintiff.” [citations omitted].
 

 Next, the
 
 Zepeda
 
 court carefully delineates through example the very specific circumstances in which class certification may be unnecessary as a legal matter, when the relief granted the individual plaintiffs necessarily includes similarly situated persons.
 

 
 *948
 
 In
 
 Bailey [v. Patterson,
 
 323 F.2d 201 (5th Cir.1963),
 
 cert denied,
 
 376 U.S. 910, 84 S.Ct. 666, 11 L.Ed.2d 609 (1964)], black plaintiffs sought desegregation of transportation facilities. This court found it unnecessary to certify a class because the relief necessary to remedy the segregated transportation for individual plaintiffs would be identical to that necessary for a class.
 

 As the court stated:
 

 They seek the right to use facilities which have been desegregated that is open to all....
 

 Zepeda,
 
 753 F.2d at 728 n. 1. In order to grant the individual plaintiffs relief, the city’s transportation system had to be desegregated. Thus, relief was granted to similarly situated non-parties, not as a practical matter, but as a matter of law. The difference is subtle, and the instances rare, but the essential factor is simple: identical relief to non-parties was inevitable to remedy the individual plaintiff's rights.
 
 Id.
 

 The
 
 Zepeda
 
 court then focuses on how Bailey’s precedent has been misconstrued to allow the denial of class certification based on the practical effect of the individual plaintiffs recovery on similarly situated persons.
 

 What some of the cases indicate, however, is that as a practical matter, injunc-tive relief for an individual plaintiff will lead to complete relief for the potential class because defendant will voluntarily treat all alike thereafter, [citations omitted]. The practical effect, of course, does not mitigate against the legal limitations that should be placed on the injunction.
 

 Id.
 

 In the instant case, the individual plaintiffs pray for and receive injunctive relief requiring the defendant to list potential defenses on pre-intercept notices. It can be plainly seen that such relief is not inevitably identical to class-wide relief. Relief for the plaintiffs may be accomplished on a very individual level (i.e. special notice for only the plaintiffs). The defendants may wish to amend its regulations and its notices to avoid inadvertently sending a defective notice to one of the individual plaintiffs or to avoid possible suits from others. Such a practical effect does not persuade courts to grant class-wide relief as a matter of law. Accordingly, this court will limit relief to the individual plaintiffs. One final quote from
 
 Zepeda
 
 may further explicate the court’s holding:
 

 Perhaps the dissent's position is intuitively attractive at first glance because we believe that it would be fundamentally unfair for the government to be able to treat one group of individuals differently from another group that is similarly situated except for the fact that they have successfully challenged the government’s actions. But our legal system does not automatically grant individual plaintiffs standing to act on behalf of all citizens similarly situated. A person who desires to be a “self-chosen representative” and “volunteer champion” [citations omitted] must qualify under rule 23. To be sure, failure to grant class relief may leave a government official temporarily in a position to continue treating non-parties in a manner that would be prohibited with respect to named plaintiffs. But that is the nature of relief, [citations omitted].
 

 Id.
 

 Accordingly, in light of the constitutional deficiency of the defendant's enforcement regulations, this court will enforce the plaintiffs’ due process rights by fashioning prospective injunctive relief for the five remaining plaintiffs only.
 

 In all future tax intercepts involving plaintiffs Wagner, Hampton, Owens, Pet-ters, Dennis and Brown, the defendants are ordered to accomplish the following:
 

 The notices already mandated by the administrative regulations found in § 160.70(c)(3) must be revised to include a list of possible defenses to the intercept. The list of the defenses need not be all inclusive but should apprise the defendants of commonly used defenses to tax refund intercepts.
 

 
 *949
 
 CONCLUSION
 

 The court grants summary judgment for the plaintiffs Wagner, Hampton, Owens, Petters, Dennis and Brown, only to the extent that the defendants are prospectively enjoined from violating the plaintiffs’ due process rights by sending to the aforementioned plaintiffs, pre-intercept notices lacking a list of potential defenses. The court grants summary judgment in favor of the defendants on all other claims.
 

 [1]
 

 . The plaintiffs, however, have failed in their motion for summary judgment to argue that the defendant has violated 42 U.S.C. § 664(a)(l)(3) of the Social Security Act. Thus, the court will not pursue that issue as found in Count II.
 

 [2]
 

 . A tax intercept is defined for our purposes as the withholding and transfer of the obligor’s tax refund to the relevant state agency. The transfer of all the plaintiff’s 1985 tax refunds occurred before the filing of the complaint.
 

 [3]
 

 . The plaintiffs filed their complaint before the more recent 1988 amendments significantly changed the enforcement regulations. In reality, the plaintiffs are complaining about the pre-May, 1988 procedures.
 

 [4]
 

 . The plaintiffs also argue that the first class mailing of the initial notices is constitutionally inadequate since many of the notices are returned unopened and the intended recipient's names are kept on the "intercept list." The
 
 *942
 
 court refrains from entertaining this issue for the simple reason that not one of the remaining plaintiffs alleges that they did not receive the original notice. (Defendant's 12(e), ¶¶ 36-72).
 

 [5]
 

 .
 
 North American Cold Storage Co. v. Chicago,
 
 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195 (1980).
 

 [6]
 

 .
 
 Bowles v. Willingham,
 
 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892 (1944).
 

 [7]
 

 . Hudson v. Palmer,
 
 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984).
 

 [8]
 

 . Section 160.70(c)(4) provides in pertinent part:
 

 "A request for redetermination made within 30 days from the date of the mailing of the advance notice shall stay the Department from submitting the past due amount to the Comptroller.” 89 Ill.Adm.Code 160.70(c)(4).
 

 The court realizes that this section applies only to state tax withholding intercepts. However, according to the affidavit of Roger L. Mun-cy, Chief of the Bureau of Child Enforcement, the federal tax intercepts have also been stayed. His affidavit reads in pertinent part, as follows:
 

 [p]rior to October 26 and 27, 1988, the dates on which the advance notices of intent to intercept were mailed, BCSE management decided as a matter of administrative practice also to stay the submittal of a past-due amount for interception of a federal tax refund if the absent parent requests a redetermi-nation of his or her account within 30 days of the date of mailing of the advance notice of intent to intercept.
 

 The Department is undertaking to modify its rule and its advance notices of intercept to reflect the BCSE practice of staying federal tax refund interceptions when there is a timely request for redetermination.
 

 (Muncy Affidavit, ¶¶ 4, 5).
 

 In light of this uncontroverted representation, the court will treat future enforcement of both federal and state tax intercepts to require staying the submittal of a past due amount for interception to the Comptroller and/or the IRS if the absent parent requests a redetermination of his or her account within 30 days of the date of mailing of the advance notice of the intercept.